Michael J. Frevola
Christopher R. Nolan
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd St.
New York, NY 10019
Telephone: (212) 513-3200
Telefax: (212) 385-9010
michael.frevola@hklaw.com
christopher.nolan@hklaw.com
marie.larsen@hklaw.com

ATTORNEYS FOR PLAINTIFF
COMMODITIES & MINERALS ENTERPRISE LTD.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITIES & MINERALS ENTERPRISE LTD., <br><br> Plaintiff, <br><br> -against- <br><br> GRETCHEN SHIPPING INC., <br><br> Defendant. | Civil Action No. 13 CV_____ |

## VERIFIED COMPLAINT

Plaintiff, Commodities & Minerals Enterprise Ltd. ("CME"), respectfully files this Verified Complaint against Defendant Gretchen Shipping Inc. ("Gretchen") and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is a maritime action involving the chartering of the *M/V GENERAL PIAR* (the "Vessel"), in which the Vessel's owner (Gretchen) and its manager non-party Kyma Ship Management Inc. ("Kyma") conspired with other non-parties, including CME's counsel, to induce CME to charter the Vessel at an above-market rate and under grossly one-sided terms, by which charter Gretchen and other non-parties profited by defrauding plaintiff CME.

2.     The Vessel was chartered by CME as a result of meetings in Florida amongst CME and Kyma (on its own behalf and as the representative of Gretchen), non-party Stephen Harrington (a consultant of Gretchen and Kyma), and non-party Gerardo Vazquez (CME's lawyer).   As described further below, Vazquez was CME's lawyer and acted as CME's representative during the charter fixture discussions.  Unknown to CME until recently, however, Vazquez had been incentivized by Kyma/Gretchen to induce CME to enter the Vessel charter through a promised kickback on each hire payment made by CME, the total of which kickbacks now exceed $500,000.

3.     Plaintiff CME seeks a Rule B attachment of Gretchen's property in this District as security for its claims in arbitration.

## JURISDICTION AND VENUE

4.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the fraudulent inducement of a maritime contract, i.e., an executed time charter party for the employment of a seagoing cargo. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is brought under the provision of Rule B of the Supplemental Rules For Certain

2

Admiralty and Maritime Claims, and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

5.      At all times material hereto, Plaintiff CME was and still is a foreign business entity organized under the laws of the British Virgin Islands.

6.      At all times material hereto, Defendant Gretchen was and is a foreign company organized under the laws of a foreign country believed to be the Republic of Liberia.

7.      The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendant, including debts payable to Gretchen, which are subject to attachment under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions.

## FACTUAL BACKGROUND

**The Parties and the Charter**

8.      Plaintiff CME is a company which specializes in the trading of commodities and minerals (primarily iron ore).  CME was and is a company organized and existing under the laws of the British Virgin Islands.  To the extent that CME has a principal place of business, CME's personnel generally operate from an office in Puerto Ordaz, Venezuela.

9.      Defendant Gretchen is the registered owner of the Vessel.  On January 25, 2010, CME time chartered the Vessel from Gretchen for a period of 60 months on the BALTIME 1939 Form, as amended by the parties (the "Charter").  A true copy of the Charter is annexed as Exhibit 1.  The Vessel is a bulk carrier, class Lloyd's Register, of approximately 62,594 dwt.

#25794220_v1

**CME's Venezuelan Iron Ore Project**

     10.    CME trades commodities and minerals, particularly iron ore, which is purchased from the mining company, non-party CVG Ferrominera Orinoco CA ("FMO") in Venezuela. CME largely sells to customers in China, but it also has provided shipments to the European and American markets.

     11.    When CME began trading in 2004, its transactions with Venezuelan suppliers were simply buy/sell transactions. Over time, however, the economic situation in Venezuela deteriorated. CME's contract partner FMO suffered severe cash flow problems, affecting its operations, including but not limited to its production capacity.

     12.    As a result of the Venezuelan economic deterioration, CME worked with FMO and adapted its business operation so that it would supply FMO with equipment and spares required by FMO under a barter arrangement (i.e., CME would provide equipment and spares to FMO in exchange for iron ore and derivative iron products). Under this arrangement, CME has been involved with a number of projects, including supplying of a ship loader, a wagon tilter and a stacker. CME has supplied over 1000 wagons to FMO, which are used for transporting material by rail from the mine to the production plant.

     13.    CME also has a contract with FMO for the operation, maintenance and management of the "Transfer System." The "Transfer System" is the name given to a particular operation for loading vessels in Puerto Ordaz. FMO owns a transfer station, which is a large vessel, the *M/V BOCA GRANDE II*, which is anchored offshore Venezuela in deep water. When vessels arrive in Venezuelan waters to load iron ore at FMO's facility, the vessels enter the Orinoco River from the Atlantic Ocean and navigate approximately 178 miles upriver to FMO's port facility. Because of draft restrictions, vessels do not load to capacity but rather load only to

4

a tonnage permitted by the river depth. The partially-laden vessels then return downriver. Once the vessels exit the river into open waters, they sail approximately 100 miles to the Transfer Station (the *M/V BOCA GRANDE II*), where the vessel will complete loading to the agreed tonnage.

14.     A number of shuttle vessels operate between FMO's port facility and the Transfer Station for purposes of keeping the Transfer Station loaded with iron ore to top off the outbound partially-laden vessels. One of those shuttle vessels is the Vessel (the *M/V GENERAL PIAR*).

**CME's Charter of the Vessel**

15.     In mid-2009, CME was advised by FMO that one of its shuttle vessels, the *M/V RIO ORINOCO*, was being taken out of service due to its age and condition. In addition, FMO's other shuttle, the *M/V RIO CARONI*, was scheduled to undergo drydocking. CME realized that it would have to replace this loss of capacity in the vessel shuttle service caused by the retirement of the *M/V RIO ORINOCO*.

16.     At this time, CME was being represented by non-party Gerardo Vazquez ("Vazquez") in a dispute with Agrico Sales Inc. ("Agrico") concerning cost overruns in a shiploader construction contract that Agrico had agreed to perform. The dispute with Agrico proceeded to arbitration in Miami, with Vazquez representing CME, and continued until an award was issued on October 30, 2012. Vazquez previously had represented CME in performing some of CME's corporate filings, in which capacity Vazquez continued to represent CME until a few weeks ago.

17.     In connection with his ongoing representation of CME discussed in the preceding paragraph, Vazquez learned from CME that it was looking to charter a vessel to replace the loss of capacity that would occur as a result of the retirement of the *M/V RIO ORINOCO*.

5

18.     After Vazquez learned from CME that it was looking for a replacement vessel, Vazquez called CME's president Mr. Tyrone Serrao and told Mr. Serrao that he had a Greek friend in the shipping business (non-party Kyma's president Paris Katsoufis) who might be able to provide a vessel for the shuttle service. Vazquez relayed to Mr. Serrao an invitation from Mr. Katsoufis for Mr. Serrao to have dinner at Mr. Katsoufis' house. Subsequent to this dinner, in November 2009, Kyma's Paris Katsoufis, Harrington, and Vazquez visited CME's operations in Venezuela with CME's Mr. Serrao to educate themselves on CME's operations.

19.     In December 2009, Kyma's president Paris Katsoufis corresponded with CME regarding the Vessel, which at that point was not yet owned by Gretchen or managed by Kyma. On December 9, 2009, Mr. Katsoufis and CME's Arturo Contreras visited the Vessel in Jacksonville, Florida to inspect it. True copies of Mr. Katsoufis' e-mails dated December 11, 2009 and December 21, 2009 regarding the Vessel (then named the *M/V CHRISTOFFER OLDENDORFF*) are annexed as Exhibit 2.

20.     On Tuesday, January 19, 2010, CME's Carlos Suarez sent to Kyma's Paris Katsoufis a proposed time charter party for purposes of discussion during upcoming negotiations regarding the Charter. That proposed time charter was a "back-to-back" version of the time charter that CME would have with FMO for the Vessel's use as a shuttle vessel.

21.     On Wednesday, January 20, 2010, CME's Arturo Contreras and Vazquez met with Kyma and Gretchen to discuss the terms of the Charter

22.     During this first day of negotiations or shortly thereafter, Kyma/Gretchen rejected CME's proposed time charter in its entirety. They explained to CME that the form proposed by CME was unacceptable, and countered with the BALTIME 1939 form that they provided to CME prior to the parties' next meeting. According to Kyma and Gretchen, the BALTIME 1939

form was the form that had to be used.  The form that Kyma/Gretchen provided, with Parts I and II already filled out, was the Charter (a true copy of which is annexed as Exhibit 1).

23.     Between Friday, January 22, 2010 and Monday, January 25, 2010, the parties met further to negotiate the Charter.  In attendance for CME for these meetings were its personnel Mr. Tyrone Serrao, Ms. Lisa Sherriff, and Mr. Carlos Suarez, as well as its attorney Vazquez.  CME's Arturo Contreras also attended a portion of the negotiations.  In attendance for Gretchen were Mr. Paris Katsoufis, Mr. Lambros Katsoufis, Mr. Mark Davis, and Harrington.   It was CME's understanding that Harrington was a consultant for the Vessel's ownership interests.

24.     During these negotiations, CME was reluctant to sign the Charter because certain terms gave CME concern, including the following: (a) Gretchen/Kyma wanted CME to agree to provide a standby irrevocable Letter of Credit to secure CME's hire payments for the Vessel; (b) Gretchen/Kyma wanted CME to cover a portion of the Vessel's War Risk Insurance for the Vessel; and (c) Gretchen/Kyma did not include a *force majeure* clause in the Charter.  At one point, during a meeting at Kyma's offices in the late afternoon/early evening of Sunday, January, 24, 2010, CME's personnel walked out of the negotiations.  Each time that CME was on the verge of ending the negotiations, however, they were assured by Vazquez that the Charter's terms − and specifically the Letter of Credit clause and lack of *force majeure* clause − were acceptable and commonplace and that CME should agree to the Charter.  As Vazquez was CME's attorney and was representing CME in a number a capacities, CME believed Vazquez when he gave CME his advice that the Charter's terms were ordinary and acceptable.

25.     Eventually, on Monday, January 25, 2010, CME agreed to execute the Charter.  The initial daily hire rate for the Vessel was $25,641.03, which rate would increase 2% per annum.  As part of the commencement of the Charter, CME opened a $2.5 million standby

7

irrevocable Letter of Credit with HSBC. Subsequently, the HSBC Letter of Credit was closed and replaced by a $2.5 million standby irrevocable Letter of Credit opened with Citibank (the "Citibank Letter of Credit").

26.     At no time before the Charter's execution did Vazquez disclose to CME that he had a financial interest in the execution of the Charter.

27.     Had CME known that Vazquez had a financial interest in the execution of the Charter, CME would have consulted with another lawyer to obtain independent advice regarding the Charter prior to executing it.

28.     Vazquez invoiced CME by retainer during the time that the Charter negotiations were taking place, which invoices CME paid and which invoices CME understood covered Vazquez's time incurred while participating in the Charter negotiations.

**Recent Developments in Venezuela**

29.     In the last two years, the situation with FMO, and with Venezuela in general, has grown increasingly worse. Despite CME's efforts to work with FMO, FMO's cash flow has continued to be a problem and, in turn, that has impacted production. As a consequence, FMO has provided CME with much less iron ore than the contractually-agreed quantity. Nevertheless, CME has continued to honor its agreements with FMO regarding the Transfer System and with Gretchen regarding the Vessel.

30.     As another way to prevent FMO's cash flow shortages from interfering with production, in 2012 CME executed an "Ex Works" contract with FMO. As part of that contract, CME paid FMO's mining subcontractors for various work performed (such as loading material from the mine, transporting it to the crushing plant for crushing, screening and separating, and transporting the finished product to FMO's port facility). In return for its paying FMO's

8

subcontractors, CME was to be reimbursed with iron ore under its Strategic Alliance Agreement with FMO.

31.     Despite CME's assistance to FMO, FMO has not performed its obligations in return.  Frequently, the material produced, which production CME helped facilitate and which should have been provided to CME, instead has been supplied to others.  Not only has FMO preferred other customers over CME, but the circumstances of some of these other transactions has led CME to question the legitimacy of those transactions.  As a result, CME's operations have been disrupted and it has caused CME problems with its customers.

32.     The most recent changes in Venezuela have made CME's situation untenable.  Within the past two to three months, major changes have taken place within FMO.  The Venezuelan military has taken over management of all government-owned companies.  One of the byproducts of the change in management is that the military has opened investigations into certain of FMO's contracts and has discovered a number of them to be irregular.

33.     As a result of its investigations, the Venezuelan military has taken the view that all of FMO's contracts are irregular.  Within the last few weeks, all supply contracts have been placed on hold.  CME now has received word that all of FMO's supply contracts are being cancelled, and CME's shipping agent in Venezuela has advised CME that an instruction has been given to release the Vessel from shuttle service immediately.  While CME is awaiting the completion of paperwork to make the termination of the Vessel's services official, CME expects official termination within the next several days.

9

**CME's Discovery of Vazquez's Duplicity**

34.     When the Venezuelan military took over management of FMO, CME contacted maritime counsel for guidance on what options CME might have with respect to the Charter in light of FMO's non-performance under its obligations to CME.

35.     As a result of that consultation, CME learned that while charter parties typically contain a "*force majeure*" clause that protects both parties against unexpected occurrences such as the events in Venezuela − especially charter parties of a vessel for an extended period of time such as the Charter and especially when the charter contemplates servicing a region in which political upheaval is a threat − the Charter did not contain such a clause because Vazquez advised CME that it was not needed.

36.     CME also learned that two clauses contained in the Charter were highly unusual: (a) Clause 20, which contained the provision that "[h]ire to be paid punctually and regularly, strictly on time and without any delay . . . .", and (b) Clause 25, which required CME to establish a $2.5 million irrevocable standby letter of credit as security for its hire payments that could be drawn upon by Gretchen immediately in the event that CME missed (or was late on) a hire payment.

37.     Other representations made by Gretchen regarding the Charter that also turned out to be materially false were the impact of the War Risk Insurance and the Vessel's loading rate. With respect to the War Risk Insurance, Gretchen advised during the Charter negotiations that the insurance premium for War Risk Insurance for the Venezuela region would be greater than normal because of the uncertain political situation. As to the amount of that insurance, Gretchen advised that the annual increase in the insurance premium compared to regular risk areas would be less than $5,000. In fact, the increase in insurance per year has been approximately $130,000.

10

With respect to the Vessel's loading rate, Gretchen represented that the Vessel would have a discharge rate of 4,500 metric tons/hour. This was the primary reason why CME was motivated to charter the Vessel, because it needed a discharge rate of at least 3,000 metric tons/hour. In actual operations, however, the Vessel discharged at rates as slow as 1,116 metric tons/hour and never more than 2,000 metric tons/hour.

38.    Furthermore, in comparing the Charter's daily hire rate against daily hire rates for other vessels on multi-year time charters fixed during the same period, the Charter's hire rate is approximately $10,000 more per day than the average daily hire rate obtained during the time period by other shipowners. From the commencement of the Charter, CME has paid approximately $13,350,000 in charter hire more than the average daily rate of hire.

39.    As a result of the one-sided nature of the Charter, CME began to examine its files with respect to the negotiation and the execution of the Charter. In particular, CME examined Vazquez's behavior in insisting that CME execute the Charter as it was proposed by Gretchen.

40.    Last week, in discussing Vazquez's actions internally, CME's president Mr. Tyrone Serrao learned from vessel operations manager Mr. Carlos Suarez that Mr. Suarez had seen a few pages of documents that contained Vazquez's name on them. Mr. Suarez has been CME's representative managing an arbitration between CME and Gretchen under the Charter concerning damage caused by the Vessel to CME's Transfer System equipment. The documents – which are Western Union payment order summaries of payments ordered by Kyma – had been produced by Gretchen's counsel to CME's counsel in late January 2013 but it was not then appreciated that the documents evidenced payments made by Gretchen and Kyma to CME's counsel or the basis for such payments.

11

41.     When Mr. Suarez reviewed his arbitration file last week, he found the two Western Union payment order summaries containing Vazquez's name on them.  True copies of those pages are annexed as Exhibit 3.   The documents that Mr. Suarez had seen were not relevant to issues in the arbitration he was managing, so he did not understand the significance of the documents.

42.     The Western Union payment summaries annexed as Exhibit 3 show that Mr. Vazquez has been receiving payments from Kyma as manager of Gretchen.  Furthermore, the payments received by Mr. Vazquez are identical in amount to payments received by another entity, non-party Vipsen Corp.

43.     Vipsen is a company owned by Harrington.  In other words, both Vazquez and Harrington, who were in the Charter negotiations as CME's and the shipowner's respective consultants, are being paid identical amounts by Kyma on Gretchen's behalf for some reason.

44.     Clause 24 of the Charter, entitled "Brokerage commission and to whom payable" (Exhibit 1, Clause 24) shows that an entity called "V&H Ventures, Ltd." is allocated a 2.5% brokerage commission on the CME's hire payments made every 15 days.  CME has never been advised what is V&H Ventures, Ltd. and whether it is in any way connected to its former attorney, Vazquez, and Kyma's and Gretchen's charter consultant, Harrington.

45.     Clause 1 of the Charter (entitled "Shipbroker"), however, has no indication that a broker (or brokers) was involved in the chartering of the Vessel.

46.     In reviewing Western Union payment summary dated September 7, 2012 in Exhibit 3, the collective sum paid to Vazquez ($4,994.42) and to Vipsen ($4,994.42), or $9,988.84, amounts to 2.5% of $399,553.60.

47.     In reviewing the Charter, Clause 19 of Exhibit 1, the daily hire payment for the first year of the Charter was $25,641.03.  Under that clause, the daily rate of hire was to increase by 2% each year.

48.     Under the Charter, in 2011 the daily hire rate rose to $26,153.85:

$25,641.03 (initial rate) x .02 (annual increase) = $512.82 + $25,641.03 = $26,153.85

49.     Under the Charter, in 2012 the daily hire rate rose to $26,676.93:

$26,153.85 (2011 rate) x .02 (annual increase) = $523.08 + $26,153.85 = $26,676.93

50.     Hire is payable under the Charter every 15 days as set forth in Part II, Clause 6 of Exhibit 1.  The hire payment due in September 2012, therefore, was $400,153.95:

$26,676.93 x 15 = $400,153.95

51.     The 2.5% commission due to "V&H Ventures, Ltd." under the Charter in September 2012, therefore, would have been the amount of $10,003.84:

$400,153.95 x .025 = $10,0003.84

52.     In comparing the amount actually received collectively by Vazquez and Vipsen in September 2012 from Kyma ($9,988.84) to the 2.5% commission that "V&H Ventures, Ltd." was supposed to receive ($10,003.84), it can be seen that there is exactly a $15.00 difference between these amounts.

13

53.     There is no active or inactive company named "V&H Ventures, Ltd." in the Florida Department of State, Division of Corporations website.  True copies of a search of each of the sections of that website (corporations, partnerships, and fictitious names) performed on Friday, September 13, 2013 are annexed as Exhibit 4.  One company named "V&H Ventures LLC" was found in the website, but that company has a principal address in Cincinnati, Ohio and an effective date of origin listed as August 16, 2013 (or over 3 ½ years after the execution of the Charter).  A true copy of the Florida Department of State, Division of Corporations listing for "V&H Ventures LLC" is annexed as Exhibit 5.

54.     "V&H Ventures, Ltd." contains the first initials of the last names of non-parties Vazquez and Harrington, both of which were part of the Charter negotiations.

55.     Based on the foregoing information, the following can reasonably be concluded:

    a.   The payments being made to Vazquz and Vipsen are in fact the commission mentioned in Clause 24 of the Charter (minus a $15.00 service charge associated with transferring the funds);

    b.   The parties used the name "V&H Ventures, Ltd." to conceal payments destined to Vazquez and Vipsen.  Not only has CME failed to find a Florida business entity with such a name, but also it appears that Kyma/Gretchen are not paying "V&H Ventures, Ltd." the commission but rather are paying that commission to Vazquez's firm and Harrington's company, neither of which is listed as an appropriate recipient of the purported "commission."

    c.   The name "V&H Ventures, Ltd." was used by Defendant Gretchen and non-parties Kyma, Harrington, Vipsen, Vazquez, and Vazquez's firm in order to fraudulently conceal from CME that CME's own lawyer had a significant

14

financial interest (to date approximately $500,000) in the Charter being consummated and had been co-opted by the other co-conspirators to convince CME to enter the egregiously one-sided Charter.

d. The conspiracy was organized prior to the commencement of the Charter negotiations. Gretchen presented the already-prepared Charter − including the brokerage commission reference to "V&H Ventures, Ltd." − to CME on the first day of Charter negotiations. Gretchen would not have known where to direct payment unless it had orchestrated the conspiracy (including the use of "V&H Ventures, Ltd.") in advance. Furthermore, despite the Charter explicitly providing the name "V&H Ventures, Ltd." as the payee of the commission, Gretchen has paid Vazquez and Vipsen rather than the stated payee under the Charter.

e. Gretchen and its co-conspirators also fostered the deception of CME by leaving Clause 1 of the Charter − the large box entitled "Shipbroker" − empty on the Charter while nevertheless including a brokerage commission at the bottom of that page. Had Clause 1 have been filled in − which should have been the case if there truly were brokers involved − it would have called to CME's attention the fact that a purported "broker" or "brokers" were involved in the transaction.

## COUNT I

## FRAUD IN THE INDUCEMENT

56. Plaintiff CME repeats and realleges each and every allegation set forth in paragraphs 1-55 hereof with the same force and effect as if fully set forth herein.

15

57.    Defendant Gretchen and non-party Kyma convinced Vazquez to act on their behalf during the Charter negotiations, in exchange for which agreement Vazquez would share a brokerage commission with Harrington.   To keep secret the existence of Vazquez's financial interest, Gretchen typed into the Charter that the recipient of such commission was "V&H Ventures, Ltd."   Even though Gretchen typed "V&H Ventures, Ltd." into the Charter as a commission recipient, Gretchen knew that "V&H Ventures, Ltd." would not be receiving the actual commission for the Charter because Gretchen's periodic payments are not made to "V&H Ventures, Ltd.," but rather to Vipsen and Vazquez.   The signatory of the Charter for Gretchen, Lambros Katsoufis, is a Florida-licensed attorney.   A true copy of the Avvo report for Lambros Katsoufis showing his status as a Florida lawyer is annexed as Exhibit 6.

58.    After this conspiracy had been arranged, Gretchen and its non-party co-conspirators all individually and jointly made one or more misrepresentations of material fact or omission to CME.   Specifically, Gretchen represented to CME through its agent Vazquez that several of the aspects of the Charter, including the absence of a *force majeure* clause, the presence of the Letter of Credit security clause, and the inflated daily hire rate, were standard and unobjectionable clauses when in fact they were not.   Furthermore, Gretchen represented to CME directly that the increased War Risk Insurance cost for the Vessel would be less than $5,000 annually (in reality the cost annually was approximately $130,000) and that the Vessel's cargo discharge rate would be 4,500 metric tons per hour (in reality the Vessel never has exceeded 2,000 metric tons per day).

59.    Gretchen knew or should have known those representations were false.   With respect to the *force majeure* clause, the Katsoufis family has been in the shipping business for a lengthy period of time.   Paris Katsoufis completely was aware of the fact that Venezuela was an

16

unstable area, as indicated by his comments in his December 11, 2009 e-mail (see Exhibit 2): "*of concern is the state of affairs in Venezuela and the unilateral decisions of its government.*" Harrington and Vazquez purported to be qualified professionals in the field. Yet Gretchen used Vazquez to convince CME that a *force majeure* clause was not necessary in a five year contract for the use of the Vessel in support of a Venezuelan-based business operation. With respect to the charter market, Gretchen knew that the proposed daily hire rate significantly exceeded the then-current market rates, but Gretchen let Vazquez convince CME of the commercial reasonableness of the Charter. Similarly, the Letter of Credit security clause is unique, yet Vazquez advised his clients that the clause was a common one. As for the Vessel's discharge rate and War Risks Insurance, the numbers represented by Kyma and Gretchen clearly could have been ascertained by Kyma and Gretchen, but instead they represented numbers to CME that were grossly overestimated and underestimated, respectively. With respect to the discharging rate, CME's interest in the Vessel was that it (purportedly) could discharge over 3,000 metric tons/hour. As shown by the attached spreadsheet regarding Vessel discharge rates, a true copy of which is annexed as Exhibit 7, that representation was demonstrably false.

60.     Gretchen intended that CME would be induced to act in reliance on one or more of the misrepresentations. Gretchen wanted CME to be induced to act because of the money that could be made by itself and others from the scheme. Gretchen and Kyma stood to make collectively approximately $10,000/day more than prevailing market rates, which has translated into over $13 million extra over the last 3 years, 8 months. Harrington and Vazquez collectively have made approximately $1 million as a result of the scheme.

61.     CME did in fact act in justifiable reliance on one or more of the misrepresentations made by Gretchen and its co-conspirators and suffered injury and damage as

17

a result.   CME was entitled to rely upon its own attorney (Vazquez) to zealously represent CME's interests in the Charter negotiation.   Vazquez was ethically obligated to act solely in CME's interest.   Vazquez was ethically obligated to tell CME if they stood to gain financially from CME's entering into the Charter.   Not only did Vazquez not reveal this financial conflict, but also Gretchen and its co-conspirators all conspired to obscure the identity of the parties receiving the commission by using the reference "V&H Ventures, Ltd."   In doing this, they deliberately hid the fact that Vazquez stood to gain financially from the Charter's execution. Furthermore, Gretchen's Lambros Katsoufis, the person signing for Gretchen, is a Florida-licensed lawyer who should have been well-aware of the conflict of interest raised by the situation.

62.   CME also had a right to expect that its attorney would have the proper expertise to advise CME on those matters on which he accepted retention.   Therefore, when CME heeded Vazquez's advice to enter into the Charter with the objectionable terms mentioned above, CME did so based upon the justifiable belief that its attorney would provide informed and conflict-free advice that would be in CME's best interests.   Instead, Vazquez acted as an advocate for Gretchen in urging CME to execute the Charter.   Had CME been aware of Vazquez's financial interest in the Charter, CME would have hired other counsel to advise it on the Charter negotiations.

63.   CME has tendered the Vessel back to Gretchen or will do so imminently.

64.   The effect of the Charter was to cause CME substantial actual damage as described above presently in an amount in excess of $13,350,000, excluding interest, costs, attorneys' fees, constituting the amount owed to CME by Gretchen because of the fraudulent acts.

#25794220_v1

65.     Alternatively, Gretchen's actions described above entitle CME to rescind the Charter and have no further obligations under the Charter, which relief CME may elect to choose after arbitration of the parties' dispute.

## REQUEST FOR WRIT OF MARITIME ATTACHMENT

66.     Part II, Clause 22 of the Charter states that any dispute between the parties may be referred to arbitration in New York in accordance with Title 9, United States Code, that such dispute shall be governed by and construed in accordance with U.S. Law, and that such arbitration shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., which Plaintiff CME intends to initiate in due course.

67.     Under the rules of the Society of Maritime Arbitrators, Inc., the prevailing party in the arbitration is entitled to an award of its attorneys' fees and expenses.  Attorneys' fees and arbitration expenses are estimated to be US400,000.

68.     It is estimated that it will take approximately two (2) years to resolve this matter. Under relevant U.S. law and arbitration procedure, a reasonable interest rate is 3.25%, resulting in the following estimated interest and attorneys' fees in addition to Plaintiff's principal claim:

| | |
|---|---|
| Interest (3.25% on US$13,350,000 for two years) | $    867,750.00 |
| Attorneys' fees and costs | $    400,000.00 |
| Principal Claim: | $13,350.000.00 |
| **Total Sought:** | **US$14,617,750.00** |

69.     Gretchen is not found within the Southern District of New York but does have goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter

19

hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the jurisdiction at the following financial institution:

Citibank, N.A.

70.     While all disputes arising out of the Charter may be arbitrated in New York, this action is submitted in accordance with Rule B of the Supplemental Rules of Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well 9 U.S.C. § 8 and should not be considered a waiver of the arbitration clause in the Charter.


**WHEREFORE**, Plaintiff Commodities & Minerals Enterprise Ltd. demands judgment as follows:

1.     That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against the Defendant Gretchen Shipping Inc. in the amount of US$14,617,750.00 (including estimated interest, attorneys' fees and arbitration costs), and if Defendant Gretchen Shipping Inc. cannot be found, then that its goods, chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits, wire transfers, accounts, letters of credit, electronic fund transfers, freights, sub-freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs to it, is claimed by it, is being held for it or on its behalf, or which is being transferred for its benefit, within the district may be attached in an amount sufficient to answer Plaintiff's claim;

2.     That Gretchen Shipping Inc. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

20

3.      That this court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court, along with awarding Plaintiff's attorney's fees and costs in connecting with these actions;

4.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

5.      That this Court grant Plaintiff such other and further relief which it may deem just and proper.

Dated: September 17, 2013
        New York, New York

                                    Respectfully submitted,

                            By: _____
                                    Michael J. Frevola
                                    Christopher R. Nolan
                                    Marie E. Larsen
                                    HOLLAND & KNIGHT LLP
                                    31 West 52nd Street
                                    New York, NY 10019
                                    Telephone:  (212) 513-3200
                                    Facsimile:  (212) 385-9010
                                    Email:  michael.frevola@hklaw.com
                                            christopher.nolan@hklaw.com
                                            marie.larsen@hklaw.com

                                    *Counsel for Commodities & Minerals
                                    Enterprise Ltd.*

21

## **VERIFICATION**

STATE OF NEW YORK               )
                                                    :ss.:
COUNTY OF NEW YORK          )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the with the firm of Holland & Knight LLP, counsel for Plaintiff Commodities & Minerals Enterprise Ltd. in the foregoing action.  I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge.  I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff regarding this matter.  I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
17th day of September, 2013

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 201_

22

#25794220_v1

# EXHIBIT 1

| 1. Shipbroker | **BIMCO UNIFORM TIME-CHARTER** **(AS REVISED 2001)** **CODE NAME: "BALTIME 1939"** |
|---|---|

PART 1

| 2. Place and date of Charter |
|---|
| MIAMI, FLORIDA 01/25/2010 |

| 3. Owners/Place of business | 4. Charters/Place of business |
|---|---|
| GRETCHEN SHIPPING INC., LIBERIA | COMMODITIES & MINERALS ENTERPRISE, LTD, BVI |

| 5. Vessel's Name | 6. GT/NT |
|---|---|
| CHRISTOFFER OLDENDORF T.B.R. GENERAL PIAR | 37,959 / 16,736 |

| 7. Class | 8. Indicated brake horse power (bhp) |
|---|---|
| LLOYD'S REGISTER | 15,400 |

| 9. Total tons d. w. (abt.) on summer freeboard | 10. Cubic feet grain/bale capacity |
|---|---|
| 62,594 | 59,703.6 CBM / 57,899.8 CBM |

| 11. Permanent bunkers (abt.) | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of |
|---|---|
|  | 13.5 KNOTS |

| 13. Present position | 14. Period of hire (Cl. 1) |
|---|---|
| TRADING | 60 MONTHS FROM DATE OF DELIVERY EXCLUDING DRYDOCKING AND/OR ANNUAL MAINTENANCE PERIODS, AND OFF-HIRE PERIOD |

| 15. Port of delivery (Cl. 1) | 16. Time of delivery (Cl. 1) |
|---|---|
| MILE MARKER 178 RIO ORINOCO | BETWEEN 02/10/2010 - 02/14/2010 UNLESS OTHERWISE AGREED |

| 17. (a) Trade limits (Cl. 2) |
|---|
| PUERTO ORDAZ, PALUA, MATANZAS, CHINA,  BOCA GRANDE, UNLESS OTHERWISE AGREED |

| (b) Cargo exclusions specially agreed |
|---|
| NO USE OF GRABS |

| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5) | 19. Charter hire (Cl. 6) |
|---|---|
| NO MAXIMUM 40 TONS MDO,  100 TONS IFO - MIN | USD 25,641.03 PER DAY, INCREASING BY 2% PER ANNUM, COMMENCING ONE YEAR AFTER DATE OF DELIVERY |

| 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6) |
|---|
| IN U.SDOLLARS BY SWIFT TRANSFER. HIRE TO BE PAID PUNCTUALLY AND REGULARLY, STRICTLY ON TIME AND WITHOUT ANY DELAY, FREE OF ANY DEDUCTIONS OR BANK CHARGES, INTO OWNERS' BANK ACCOUNT......................................................... IN FAVOR OF  GRETCHEN SHIPPING INC. THROUGHOUT THE CHARTER PERIOD. |

| 21. Place or range of re-delivery (Cl. 7) | 22. Cancelling date (Cl. 21) |
|---|---|
| BOCA GRANDE II OR ANY OTHER PORT MUTUALLY AGREED | TO BE AGREED |

| 23. Dispute resolution (state 22(A), 22(B) or 22(C); if 22(C) agreed Place of Arbitration must be stated) (Cl. 22) | 24. Brokerage commission and to whom payable (Cl. 24) |
|---|---|
| 22 (B) | V & H VENTURES, LTD.  2.5% |

| 25. Numbers of additional clauses covering special provisions, if agreed |
|---|
| 25 - 69 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Issued 1909. Amended 1911; 1912; 1920; 1939; 1950; 1974; and 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen

| (continued) | "BALTIME 1939" (Revised 2001) UNIFORM TIME-CHARTER | PART I |
|---|---|---|
| Signature (Owners) | Signature (Charterers) | |
| *Secretary* 1-25-10 *Gretchen Shipping Inc.* | 1-25-10 | |

This document is a computer generated VOLCOA form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 5 of the grossfeet tonnage indicated in Box 6, classed as stated in Box 7 and of indicated brake horse power (bhp) as stated in Box 8, carrying about the number of tons deadweight indicated in Box 9 on summer freeboard inclusive of bunkers, stores and provisions, having as per builder's plan a cubic-feet grain/bale capacity as stated in Box 10, exclusive of permanent bunkers, which contain about the number of tons stated in Box 11, and fully loaded capable of steaming about the number of knots indicated in Box 12 in good weather and smooth water on a consumption of about the number of tons fuel oil stated in Box 12, now in position as stated in Box 13 and the party mentioned as Charterers in Box 4, as follows:

1. **Period/Port of Delivery/Time of Delivery**
The Owners let, and the Charterers hire the Vessel for a period of the number of calendar months indicated in Box 14 from the time of her arrival at her 178 station at the port of vessel's delivery any time of day or night Sundays, Saturdays and Holidays included (not a Sunday or a legal Holiday
unless taken over) the Vessel is delivered and placed at the disposal of the Charterers between 9 a.m. and 6 p.m., or between 9 a.m. and 2 p.m. if on Saturday, at the port stated in Box 15 in such available berth where she can safely lie always afloat, as the Charterers may direct. The Vessel being in every way fitted for ordinary cargo service. The Vessel shall be delivered at the time indicated in Box 16.

2. **Trade**
The Vessel shall be employed in lawful trades for the carriage of lawful dry bulk cargo merchandise only between safe ports
or places where the Vessel can safely lie always afloat within the limits stated in Box 17. No live stock nor injurious, inflammable or dangerous goods (such as acids, explosives, calcium carbide, ferro silicon, naphtha, motor spirit, tar, or any of their products) shall be shipped.

3. **Owners' Obligations**
The Owners shall provide and pay for all provisions and Wages, for ordinary H+M and P+I insurance of the Vessel, for all deck and
Engine-room stores and maintain her in a thoroughly efficient state in hull and machinery during service. The Owners shall provide winchmen or other qualified shoremen for loading/discharging operations of the ship and suitable ship's fenders for ship to ship transfers. The vessel shall be fitted with special self-unloading machinery for discharging bulk cargo.
Owners shall provide winchmen from the crew to operate the Vessel's cargo handling gear, unless the crew's employment conditions or local union or port regulations prohibit this, in which case qualified shore-winchmen shall be provided and paid for by the Charterers.

4. **Charterers' Obligations**
The Charterers shall provide and pay for all fuel oil, port charges, pilotages (whether compulsory or not), canal steersmen, boatage, lights, tug-assistance, consular charges (except those pertaining to the Master, officers and crew), canal, dock and other dues and charges, including any foreign general municipality or state taxes. also all dock, harbour and tonnage dues at the ports of delivery and re-delivery (unless incurred through cargo carried before delivery or after re-delivery), agencies, commissions, also shall arrange and pay for loading,

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |
| | 26 |
| | 27 |
| | 28 |
| | 29 |
| | 30 |
| | 31 |
| | 32 |
| | 33 |
| | 34 |
| | 35 |
| | 36 |
| | 37 |
| | 38 |
| | 39 |
| | 40 |
| | 41 |
| | 42 |
| | 43 |
| | 44 |
| | 45 |
| | 46 |
| | 47 |
| | 48 |
| | 49 |
| | 50 |
| | 51 |
| | 52 |
| | 53 |
| | 54 |
| | 55 |
| | 56 |
| | 57 |
| | 58 |

trimming, stowing (including dunnage and shifting boards, excepting any already on board), unloading, weighing, tallying and delivery of cargoes, surveys on hatches, meals supplied to officials and men in their service and all other charges and expenses whatsoever including detention and expenses through quarantine (including cost of fumigation and disinfection). All ropes, slings and special runners actually used for loading and discharging and any special gear, including special ropes and chains required by the custom of the port for mooring shall be for the Charterers' account. The Vessel shall be fitted with winches, derricks, wheels and or-dinary runners capable of handling lifts up to 2 tons.

5. **Bunkers**
The Charterers at port of delivery and the Owners at port of re-delivery shall take over and pay for all fuel oil remaining in the Vessel's bunkers as per last invoice per ton with accompanied proof of payment, at current-price at the respective-ports. The Vessel shall be re-delivered with not less than the number of tons and not exceeding the number of tons of fuel oil in the Vessel's bunkers stated in Box 18.

6. **Hire**
The Charterers shall pay as hire the rate stated in Box 19 per 15.30 days, commencing in accordance with Clause 1 until her re-delivery to the Owners.
Payment of hire shall be made in cash, in the currency stated in Box 20, without discount, every 15.30 days, in advance, and in the manner prescribed in Box 20, in default of payment the Owners shall have the right of withdrawing the Vessel from the service of the Charterers, without noting any protest and without interference by any court or any other formally whatsoever and without prejudice to any claim the Owners may otherwise have on the Charterers under the Charter.

7. **Re-delivery**
The Vessel shall be re-delivered on the expiration of the Charter in the same good order as when delivered to the Charterers (fair wear and tear excepted) at an ice-free port in the Charterers' option at the place or within the range stated in Box 21, at any time day or night Saturdays, Sundays and Holidays included between 9 a.m. and 6 p.m.,
and 9 a.m. and 2 p.m. on Saturday; but the day of re-delivery shall not be a Sunday or legal Holiday.
The Charterers shall give the Owners not less than thirty (30) ten
days' notice at which port and on about which day the Vessel will be re-delivered. Should the Vessel be ordered on a voyage by which the Charter period will be exceeded the Charterers shall have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow redelivery about the time fixed for the termination of the Charter, but for any time exceeding the termination date the Charterers shall pay the market rate if higher than the rate stipulated herein.

8. **Cargo Space**
The whole reach and burthen of the Vessel, including lawful deck-capacity shall be at the Charterers' disposal, reserving proper and sufficient space for the Vessel's Master, officers, crew, tackle, apparel, furniture, provisions and stores.

9. **Master**
The Master shall prosecute all voyages with the utmost despatch and shall render customary assistance with the Vessel's crew. The Master shall be under the orders

| | |
|---|---|
| | 59 |
| | 60 |
| | 61 |
| | 62 |
| | 63 |
| | 64 |
| | 65 |
| | 66 |
| | 67 |
| | 68 |
| | 69 |
| | 70 |
| | 71 |
| | 72 |
| | 73 |
| | 74 |
| | 75 |
| | 76 |
| | 77 |
| | 78 |
| | 79 |
| | 80 |
| | 81 |
| | 82 |
| | 83 |
| | 84 |
| | 85 |
| | 86 |
| | 87 |
| | 88 |
| | 89 |
| | 90 |
| | 91 |
| | 92 |
| | 93 |
| | 94 |
| | 95 |
| | 96 |
| | 97 |
| | 98 |
| | 99 |
| | 100 |
| | 101 |
| | 102 |
| | 103 |
| | 104 |
| | 105 |
| | 106 |
| | 107 |
| | 108 |
| | 109 |
| | 110 |
| | 111 |
| | 112 |
| | 113 |
| | 114 |
| | 115 |
| | 116 |
| | 117 |
| | 118 |
| | 119 |
| | 120 |
| | 121 |

This document is a computer generated BALTIME 1939 revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

| | |
|---|---|
| of the Charterers as regards employment, agency, or | 122 |
| other arrangements. The Charterers shall indemnify the | 123 |
| Owners against all consequences or liabilities arising | 124 |
| from the Master, officers or Agents signing Bills of Lading | 125 |
| or other documents or otherwise complying with such | 126 |
| orders, as well as from any irregularity in the Vessel's | 127 |
| papers or for overcarrying goods. The Owners shall not | 128 |
| be responsible for shortage, mixture, marks, nor for | 129 |
| Number of pieces or packages, nor for damage to or | 130 |
| claims on cargo caused by bad stowage or otherwise. If | 131 |
| the Charterers have reason to be dissatisfied with the | 132 |
| conduct of the Master or any officer, the Owners, on | 133 |
| receiving particulars of the complaint, promptly to | 134 |
| investigate the matter, and, if necessary and practicable, | 135 |
| to make a change in the appointments. | 136 |

**10. Directions and Logs**

| | |
|---|---|
| The Charterers shall furnish the Master with all | 137 |
| instructions and sailing directions and the Master shall | 138 |
| keep full and correct logs accessible to the Charterers | 139 |
| or their Agents. | 140 |
| | 141 |

**11. Suspension of Hire etc.**

| | |
|---|---|
| (A) In the event of drydocking or other necessary | 142 |
| measures to maintain the efficiency of the Vessel, | 143 |
| deficiency of men or Owners' stores, breakdown of | 144 |
| machinery, damage to hull or other accident, either | 145 |
| hindering or preventing the working of the Vessel and | 146 |
| continuing for more than twenty-four consecutive hours, | 147 |
| no hire shall be paid in respect of any time lost thereby | 148 |
| during the period in which the Vessel is unable to perform | 149 |
| the service immediately required. Any hire paid in | 150 |
| advance shall be adjusted accordingly. | 151 |
| (B) In the event of the Vessel being driven into port or to | 152 |
| anchorage through stress of weather, trading to shallow | 153 |
| harbours or to rivers or ports with bars or suffering an | 154 |
| accident to her cargo, any detention of the Vessel and/or | 155 |
| expenses resulting from such detention shall be for the | 156 |
| Charterers' account, even if such detention and/or | 157 |
| expenses, or the cause by reason of which either is | 158 |
| incurred, be due to, or be contributed to by, the | 159 |
| negligence of the Owners' servants. | 160 |
| | 161 |

**12. Responsibility and Exemption**

| | |
|---|---|
| The Owners only shall be responsible for delay in | 162 |
| delivery of the Vessel or for delay during the currency of | 163 |
| the Charter and for loss or damage to goods onboard, if | 164 |
| such delay or loss has been caused by want of due | 165 |
| diligence on the part of the Owners or their Manager in | 166 |
| making the Vessel seaworthy and fitted for the voyage | 167 |
| or any other personal act or omission or default of the | 168 |
| Owners or their Manager. The Owners shall not be | 169 |
| responsible in any other case nor for damage or delay | 170 |
| whatsoever and howsoever caused even if caused by | 171 |
| the neglect or default of their servants. The Owners shall | 172 |
| not be liable for loss or damage arising or resulting | 173 |
| from strikes, lock-outs or stoppage or restraint of labour | 174 |
| (including the Master, officers or crew) whether partial | 175 |
| or general. The Charterers shall be responsible for loss | 176 |
| or damage caused to the Vessel or to the Owners by | 177 |
| goods being loaded contrary to the terms of the Charter | 178 |
| or by improper or careless bunkering or loading, stowing | 179 |
| or discharging of goods or any other improper or | 180 |
| negligent act on their part or that of charterer's their | 181 |
| servants. | 182 |

**13. Advances**

| | |
|---|---|
| The Charterers or their Agents shall advance to the | 183 |
| Master, if required, necessary funds for ordinary | 184 |
| disbursements for the Vessel's account at any port | 185 |
| charging only interest at 6-3 (three) per cent. p.a., such | 186 |
| advances | 187 |

| | |
|---|---|
| shall be deducted from hire. | 188 |

**14. Excluded Ports**

| | |
|---|---|
| The Vessel shall not be ordered to nor bound to enter: | 189 |
| (A) any place where fever or epidemics are prevalent or | 190 |
| to which the Master, officers and crew by law are not | 191 |
| bound to follow the Vessel; | 192 |
| (B) any ice-bound place or any place where lights, | 193 |
| lightships, marks and buoys are or are likely to be | 194 |
| withdrawn by reason of ice on the Vessel's arrival or | 195 |
| where there is risk that ordinarily the Vessel will not be | 196 |
| able on account of ice to reach the place or to get out | 197 |
| after having completed loading or discharging. The | 198 |
| Vessel shall not be obliged to force ice. If on account of | 199 |
| ice the Master considers it dangerous to remain at the | 200 |
| loading or discharging place for fear of the Vessel being | 201 |
| frozen in and/or damaged, he has liberty to sail to a | 202 |
| convenient open place and await the Charterers' fresh | 203 |
| instructions. Unforeseen detention through any of above | 204 |
| causes shall be for the Charterers' account. | 205 |
| | 206 |

**15. Loss of Vessel**

| | |
|---|---|
| Should the Vessel be lost or missing, hire shall cease | 207 |
| from the date when she was lost. If the date of loss | 208 |
| cannot be ascertained half hire shall be paid from the | 209 |
| date the Vessel was last reported until the calculated | 210 |
| date of arrival at the destination. Any hire paid in advance | 211 |
| shall be adjusted accordingly. | 212 |
| | 213 |

**16. Overtime**

| | |
|---|---|
| The Vessel shall work day and night if required. | 214 |
| Charter hire includes officers and crew overtime. | 215 |
| The | |
| Charterers shall refund the Owners their outlays for all | 216 |
| overtime paid to officers and crew according to the hours | 217 |
| and rates stated in the Vessel's articles. | 218 |

**17. Lien**

| | |
|---|---|
| The Owners shall have a lien upon all cargoes and | 219 |
| sub-freights belonging to the Time-Charterers and any | 220 |
| Bill of Lading freight for all claims under this Charter, | 221 |
| and the Charterers shall have a lien on the Vessel for all | 222 |
| moneys paid in advance and not earned. | 223 |

**18. Salvage**

| | |
|---|---|
| All salvage and assistance to other vessels shall be for | 224 |
| the Owners' and the Charterers' equal benefit after | 225 |
| deducting the Master's, officers' and crew's proportion | 226 |
| and all legal and other expenses including hire paid | 227 |
| under the charter for time lost in the salvage, also repairs | 228 |
| of damage and fuel oil consumed. The Charterers shall | 229 |
| be bound by all measures taken by the Owners in order | 230 |
| to secure payment of salvage and to fix its amount. | 231 |


**19. Sublet**

| | |
|---|---|
| The Charterers shall have the option of subletting the | 234 |
| Vessel, subject to Owners' approval, not to be unreasonably | 235 |
| withheld, giving due notice to the Owners, but the original | 236 |
| Charterers shall always remain responsible to the | 237 |
| Owners for due performance of the Charter. | 238 |

**20. War ("Conwartime 1993")**

| | |
|---|---|
| (A) For the purpose of this Clause, the words: | 239 |
| (i) "Owners" shall include the shipowners, bareboat | 240 |
| charterers, disponent owners, managers or other | 241 |
| operators who are charged with the management of the | 242 |
| Vessel, and the Master; and | 243 |
| (ii) "War Risks" shall include any war (whether actual or | 244 |
| threatened), act of war, civil war, hostilities, revolution, | 245 |
| rebellion, civil commotion, warlike operations, the laying | 246 |
| of mines (whether actual or reported), acts of piracy, | 247 |
| acts of terrorists, acts of hostility or malicious damage, | 248 |
| blockades (whether imposed against all vessels or | 249 |
| | 250 |

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of the document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

imposed selectively against vessels of certain flags or 251
ownership, or against certain cargoes or crews or 252
otherwise howsoever), by any person, body, terrorist or 253
political group, or the Government of any state 254
whatsoever, which, in the reasonable judgement of the 255
Master and/or the Owners, may be dangerous or are 256
likely to be or to become dangerous to the Vessel, her 257
cargo, crew or other persons on board the Vessel. 258
(B) The Vessel, unless the written consent of the Owners 259
be first obtained, shall not be ordered to or required to 260
continue to or through, any port, place, area or zone 261
(whether of land or sea), or any waterway or canal, where 262
it appears that the Vessel, her cargo, crew or other 263
persons on board the Vessel, in the reasonable 264
judgement of the Master and/or the Owners, may be, or 265
are likely to be, exposed to War Risks. Should the Vessel 266
be within any such place as aforesaid, which only 267
becomes dangerous, or is likely to be or to become 268
dangerous, after her entry into it, she shall be at liberty 269
to leave it. 270
(C) The Vessel shall not be required to load contraband 271
cargo, or to pass through any blockade, whether such 272
blockade be imposed on all vessels, or is imposed 273
selectively in any way whatsoever against vessels of 274
certain flags or ownership, or against certain cargoes 275
or crews or otherwise howsoever, or to proceed to an 276
area where she shall be subject, or is likely to be subject 277
to a belligerent's right of search and/or confiscation. 278
(D) (i) The Owners may effect war risks insurance in 279
respect of the Hull and Machinery of the Vessel and their 280
other interests (including, but not limited to, loss of 281
earnings and detention, the crew and their Protection 282
and Indemnity Risks), and the premiums and/or calls 283
therefor shall be for their account. 284
(ii) If the Underwriters of such insurance should require 285
payment of premiums and/or calls because, pursuant 286
to the Charterers' orders, the Vessel is within, or is due 287
to enter and remain within, any area or areas which are 288
specified by such Underwriters as being subject to 289
additional premiums because of War Risks, then such 290
premiums and/or calls shall be reimbursed by the 291
Charterers to the Owners at the same time as the next 292
payment of hire is due. 293
Charterers acknowledge that Venezuela is an additional
premium area. So any extra insurance premium of any
nature whatsoever to be paid for by the Charterers upon
their being presented with Owners' insurers official
vouchers.
(E) If the Owners become liable under the terms of 294
employment to pay to the crew any bonus or additional 296
wages in respect of sailing into an area which is 297
dangerous in the manner defined by the said terms, 298
then such bonus or additional wages shall be re- 299
imbursed to the Charterers at the same 300
time as the next payment of hire is due.
(F) The Vessel shall have liberty:- 301
(i) to comply with all orders, directions, recom- 302
mendations or advice as to departure, arrival, routes, 303
sailing in convoy, ports of call, stoppages, destinations, 304
discharge of cargo, delivery, or in any other way 305
whatsoever, which are given by the Government of the 306
Nation under whose flag the Vessel sails, or other 307
Government to whose laws the Owners are subject, or 308
any other Government, body or group whatsoever acting 309
with the power to compel compliance with their orders 310
or directions; 311
(ii) to comply with the order, directions or recom- 312
mendations of any war risks underwriters who have the 313
authority to give the same under the terms of the war 314
risks insurance; 315

(iii) to comply with the terms of any resolution of the 316
Security Council of the United Nations, any directions of 317
the European Community, the effective orders of any 318
other Supranational body which has the right to issue 319
and give the same, and with national laws aimed at 320
enforcing the same to which the Owners are subject, 321
and to obey the orders and directions of those who are 322
charged with their enforcement; 323
(iv) to divert and discharge at any other port any cargo or 324
part thereof which may render the Vessel liable to 325
confiscation as a contraband carrier; 326
(v) to divert and call at any other port to change the crew 327
or any part thereof or other persons on board the Vessel 328
when there is reason to believe that they may be subject 329
to internment, imprisonment or other sanctions. 330
(G) If in accordance with their rights under the foregoing 331
provisions of this Clause, the Owners shall refuse to 332
proceed to the loading or discharging ports, or any one 333
or more of them, they shall immediately inform the 334
Charterers. No cargo shall be discharged at any 335
alternative port without first giving the Charterers notice 336
of the Owners' intention to do so and requesting them 337
to nominate a safe port for such discharge. Failing such 338
nomination by the Charterers within 48 hours of the 339
receipt of such notice and request, the Owners may 340
discharge the cargo at any safe port of their own choice. 341
(H) If in compliance with any of the provisions of sub- 342
clauses (B) to (G) of this Clause anything is done or not 343
done, such shall not be deemed a deviation, but shall 344
be considered as due fulfilment of this Charter. 345

**21. Cancelling** 346
Should the Vessel not be delivered by the date indicated 347
in Box 22, the Charterers shall have the option of 348
cancelling. If the Vessel cannot be delivered by the 349
cancelling date, the Charterers, if required, shall declare 350
within 48 hours after receiving notice thereof whether 351
they cancel or will take delivery of the Vessel. 352

**22. Dispute Resolution** 353
(A) This Charter shall be governed by and construed in 354
accordance with English law and any dispute arising 355
out of or in connection with this Charter shall be referred 356
to arbitration in London in accordance with the Arbitration 357
Act 1996 or any statutory modification or re-enactment 358
thereof save to the extent necessary to give effect to the 359
provisions of this Clause. 360
The arbitration shall be conducted in accordance with 361
the London Maritime Arbitrators Association (LMAA) 362
Terms current at the time when the arbitration 363
proceedings are commenced. 364
The reference shall be to three arbitrators. A party 365
wishing to refer a dispute to arbitration shall appoint its 366
arbitrator and send notice of such appointment in writing 367
to the other party requiring the other party to appoint its 368
own arbitrator within 14 calendar days of that notice and 369
stating that it will appoint its arbitrator as sole arbitrator 370
unless the other party appoints its own arbitrator 371
and gives notice that it has done so within the 14 days 372
specified. If the other party does not appoint its own 373
arbitrator and give notice that it has done so within the 374
14 days specified, the party referring a dispute to 375
arbitration may, without the requirement of any further 376
prior notice to the other party, appoint its arbitrator as 377
sole arbitrator and shall advise the other party 378
accordingly. The award of a sole arbitrator shall be 379
binding on both parties as if he had been appointed by 380
agreement. 381
Nothing herein shall prevent the parties agreeing in 382
writing to vary these provisions to provide for the 383

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. The original BIMCO approved document and this computer generated document. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

appointment of a sole arbitrator. 384

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced. 385-390

*) (B) This Charter shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. 391-402

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced. 403-408

*) (C) This Charter shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Charter shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there. 409-414

(D) Notwithstanding (A), (B) or (C) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter. 415-419

In the case of a dispute in respect of which arbitration has been commenced under (A), (B) or (C) above, the following shall apply:- 420-421

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation. 422-426

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall 427-434

be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator. 435-438

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties. 439-442

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest. 443-445

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration. 446-450

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses. 451-454

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration. 455-459

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.) 460-461

(E) If Box 23 in Part I is not appropriately filled in, sub-clause (A) of this Clause shall apply. Sub-clause (D) shall apply in all cases. 462-464

(A), (B) and (C) are alternatives; indicate alternative agreed in Box 23. 465-466

*

**23. General Average**

General Average shall be settled according to York/Antwerp Rules, 1994 and any subsequent modification thereof. Hire shall not contribute to General Average. 467-470

**24. Commission**

The Owners shall pay a commission at the rate stated in Box 24 to the party mentioned in Box 24 on any hire paid under the Charter, but in no case less than is necessary to cover the actual expenses of the Brokers and a reasonable fee for their work. If the full hire is not paid owing to breach of Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission not to exceed the brokerage on one year's hire. 471-483

ADDITIONAL CLAUSES NO. 25 THROUGH TO NO. 69, BOTH INCLUSIVE, FORM PART OF THIS C/P AND FULLY APPLY.

FOR THE OWNERS            FOR THE CHARTERERS

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ADDITIONAL CLAUSES TO THE C/P DATED JANUARY 25, 2010

M/V CHRISTOFFER OLDENDORFF t.b.r. GENERAL PIAR

25. Security

Charterers shall cause a first class bank acceptable to Owners to issue an Irrevocable Standby Letter of Credit,("Standby L/C"), in the amount of USD 2,500,000.00 in favor of Owners.

The Standby L/C shall be issued concurrently with the date of this Charter in accordance with the following terms of drawdown:

- Issuing Bank: First class bank with offices in Miami that is acceptable to Owners
- Validity of Letter of Credit: 5 years plus 60 days from the date of issuance
- Aggregate amount of Irrevocable Standby L/C: US$2,500,000
- Purpose: To secure payment obligations of the Charterers to Owners
- Partial Draws permitted
- Documents required for drawdown either:
  - Non-payment of Charter Hire- Beneficiary's draft (s) at sight drawn on (name of issuing bank) accompanied by a statement signed by someone purporting to be an Officer of the Beneficiary, certifying that the Applicant, Commodities & Minerals Enterprise Ltd., has not paid Charter Hire due on (due date of payment) under the Charter Agreement between Gretchen Shipping Inc. and Commodities Minerals Enterprise Ltd.; or
  - Beneficiary's draft at sight drawn on (name of issuing bank) accompanied by a copy of an arbitration award against the Applicant and in favor of the Beneficiary
- Limitations to amounts drawn for non-payment of Charter Hire: Beneficiary shall not be able to draw down more than US$769,230.90 in the first year of the Charter, increasing by 2% in each succeeding year, for reasons of non-payment of Charter Hire for a period of 30 days after the initial draw down for non-payment of Charter Hire. If the Applicant has not effected an amendment to the Standby L/C or caused a new Standby L/C to be issued in favor of the Beneficiary within the 30-day period so as to once again provide the Beneficiary with a total of US$2,500,000 in its favor in the form of an Irrevocable Standby Letter of Credit(s), then the Beneficiary can draw down the full amount remaining under the Letter of Credit.
- If the Beneficiary received notice from the issuing bank that the Letter of Credit will not be renewed or is being cancelled, then the Beneficiary shall be able to draw down the full amount of the Letter of Credit

26. On arrival at first loading port the Vessel's holds are to be clean, dry and free from dust and in all respects ready to load a full cargo.

27. The Charterers to have the option of redelivering the Vessel unclean and Charterers to pay us$ 2500 lumpsum with last hire

28. Owners to give the Charterers 15/10/5/3/2 days approximate notice and 24 hrs definite Notice of delivery.  For redelivery Charterers are to give Owners 25 days notice of redelivery with intended port followed by 15/10/5/3 days approximately Notice of redelivery and 48/24 hrs definite Notice of redelivery with final port.

29. Owners and Charterers to share equal 50/50, time and expense for delivery/on-hire and redelivery/off-hire survey. Reports shall be prepared and signed by an independent surveyor appointed jointly by Owners and Charterers.  Survey fees to be shared equally.

30. Any damage caused by stevedores during the period of this Charter shall be reported by the Master to the Charterers or their Agents in writing within 24 hours of the occurrence or as soon as possible thereafter, but latest when the damage could have been discovered by the exercise of due diligence. The Master shall do his best to obtain written acknowledgment by the responsible parties that caused the damage, unless the damage has been made good in the meantime.

Stevedoring damage affecting seaworthiness or the proper work of the Vessel and/or her equipment shall be repaired without delay to the Vessel after each occurrence in the Charterers' time and at their expense.

All damages which are to be repaired by Charterers and which are not fair wear and tear and do not affect the Vessel's seaworthiness, are to remain for subsequent repair when Vessel is to dock for Owners' account so that Charterers pay the actual cost of such repairs, but not for the time used, except when such time is beyond what Owners require to complete their works.

31. The Charterers shall leave the Vessel in seaworthy condition and with cargo on board, safely stowed to the Master's satisfaction between loading berth/ports and discharging berth/ports. Any expenses resulting therefrom shall be for Charterers' account and any time used shall count as on-hire time.

32. The Charterers have the privilege of loading cargo on deck and on hatches at their risk and expense in accordance with good sea practices and with the permissible cargo loading as per the shipbuilder's, stability and visibility and to master's satisfaction. Any deck cargo is always subject to the Master's approval in respect of the Vessel's seaworthiness. All Bills of lading concerning deck cargo to display a clause, stating that it is being carried on deck at shippers' or Charterers' risk (as the case may be) and responsibility. Insurance for Deck Cargo to be for Charterers' account

33. Watchmen for the Vessel, if required by the Master, to be for the Owners' account, unless it is compulsory to take watchmen from the shore in which case the same are to be for the Charterers' account and same to be agreed/arranged directly with the Master.

34. Cargo to be always loaded, stowed, carried and discharged in compliance with relevant local regulations and IMO requirements.

35. The Vessel shall be capable, at all times during the currency of this Charter, of steaming as per directions in good weather conditions for the purpose of this Charter. Good weather conditions are to be defined as weather conditions in winds speeds not exceeding Beaufort force 4 (four) and sea Douglas State 3(three), and with good visibility.

36. All cargo to be loaded/carried and discharged under the Master's supervision and in accordance with the requirements of the Vessel's strength and stability specifications.

37. Should the Vessel be on her voyage towards the port of redelivery at the time when payment of hire is due, Owners and Charterers or their agents shall consider the estimated time necessary to complete the voyage when calculating the payment due.

When the Vessel is redelivered any difference shall be refunded by the Owners or paid by the Charterers, as may be required, less any Owners' expenses and actual bunkers remaining on re-delivery.

38. Intentionally left blank.

39. The Vessel to work night and day/or weekend/holidays, if requested by Charterers, and duly rigged by crew at all time as requested by the Charterers. All gear to be at the Charterers' disposal during loading and discharging the Vessel to allow the crew to work day and night, also to open and close hatches, to remove and replace beams and hatch boards or pontoons, where so fitted, as required by the Charterers.

All opening/closing of hatches to be done by crew, whenever required by Charterers. If the rules of the port or labor unions prevent the crew from opening or closing hatches, removing and replacing beams and hatch boards or pontoons, where so fitted, shore labor to be paid by the Charterers. In the event of disabled gear or insufficient power to operate gear, the Owners to pay for suitable substitute shore engine(s) and also for any stevedores standby time occasioned thereby but limited to one shift. Hire to be reduced proportionally to the total number of working hatches, for all time the gear is unavailable due to disability or loss of power.

40. Intentionally left blank.

41. Owners shall provide Charterers with seven days notice to request fuel supply from the Charterers. The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the Vessel's fuel specification(s).

The Owners reserve the right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed, performance and/or increased bunker consumption, nor for any time lost and/or other consequences.

Master/Chief Engineer to satisfy themselves prior to the commencement of bunkering with the quality to be supplied and to always retain 1 (one) sample on board for verification. Any quality claims of substandard fuel to be notified to bunker supplier and Charterers within 72hrs after receiving the laboratory results of bunkering otherwise any claim to be void.

All bunkers to be delivered with clear acknowledgement of the bunkering company that the bunkers are ordered and are for the account of Charterers. Master will log all bunkers receipts accordingly.

Charterers to present Owners with evidence (swift advices) of payments for all bunkers.

42. Intentionally left blank

43. The Charterers may deduct from the monthly hire any amount disbursed for Owners' account and supported by vouchers or necessary proof. The Charterers may deduct from the last payment of hire the value of bunkers estimated to be on board at redelivery and estimated expenses incurred by the Charterers for the Owners' account, for which, however, vouchers have not yet reached the Charterers for submission to the Owners provided such expenses were paid on behalf of the Owners with the Owners' prior approval.

44. Intentionally left blank

45. The Owners warrant that the Vessel shall always be safe in ballast without solid ballast being required. The Vessel shall comply with any local, national or international regulations regarding water pollution. The Vessel also to possess and carry on board a certificate of financial responsibility (oil pollution).

46. The Master, if requested to do so by Charterers, their agents or supercargo, is to sign Charterers' Bill of Lading for cargo as presented in conformity with Mate's receipts without prejudice to this Charter . Master and Owners can authorize Charterers or their agents to sign Bill(s) of Lading on Charterers' behalf in conformity with Mate's receipts. Owners/Master to allow discharge of the

cargo without presentation of Bill(s) of Lading against a Letter of Indemnity as per Owners' P+I club standard wording which to be signed by Charterers. Charterers assuming full liability for such discharge.

The cargo will be discharged in the custody of the Charterers' agents, the port authorities or customs officials, as the custom of the port may be and it is they who will effect actual delivery of the cargo. Should any cargo Receiver/Bill of Lading holder sue the Owners for non-delivery to them of any cargo for reason of the cargo having been delivered to a party not entitled thereto, Charterers will defend such proceeding and indemnify Owners against all losses and consequences.

For change of destination same procedure to be followed with Letter of Indemnity as per Owners' P+I club wording, signed by Charterers.

47. All references to time are understood to be in GMT.

48. The Charterers to have full use of Vessel radio/TLX/FAX/ Mail communication. Owners will arrange direct e-mail transfer between Vessel and Charterers. Charterers to pay for such usage per 30 days (month) pro rata and to be paid with Vessel's hire.

49. Trading always within I.W.L., always afloat via safe ports, safe berths, safe anchorages excluding St Laurence, Cuba (except with US Licensed cargoes or if US ban has been lifted against Cuba. Charterers warrant that if trading to Cuba under these conditions, Vessel will not be black listed in the US and Vessel redelivered free of USA ban), Israel, Iraq, Libya, Lebanon, Cabinda, Amazon River (but Belem and
Vila do Conde allowed), Orinoco River trade permitted however deep sea pilot to be for Charterers' account, Eritrea,Somalia, Gulf of Aden, Nigeria, Sierra Leone, Pakistan, Magellan Strait, Cape Horn Transiting, Hudson Bay, Turkish occupied Cyprus, Syria, Somalia, North Korea, Pacific coast of Russia, any war risk area and any warlike zones in any country where the U.N. decides to boycott or ban the trade, no direct  trading between China and Taiwan and between Turkey and Cyprus, Mindanao, between the ports of Polloc Harbour and Mati incl.

Charterers shall have the option to breach IWL 1/7/76 and Extra War Risks Listed Areas of Joint War Committee Hull, War, Strikes, Terrorism and Related perils, but only after receiving Owner's prior confirmation/agreement. Charterers shall reimburse Owners any extra insurance premium incurred.

On completion of discharge of cargo at any port called under this Charter - Charterers to arrange Vessel's departure without delay.
Charterers undertake to hold Owners harmless against any claim which may arise by the receivers' side or any third parties including customs offices and /or local court procedures for shortlanded

cargo, detention and/or arrest thereof, bank guarantees, and/or direct payment of the claimed amount to receivers. Vessel to remain always on-hire.

50. All taxes and dues on the Vessel and/or cargo and on Charterers' hire and on freight all of which arising from cargoes carried to ports visited under the Charter shall be for Charterers' Account.

51.Chamber of shipping nuclear clause and ISPS/MTSA clause for T/C 2005 to be incorporated in this Charter. All Bills of Lading issued under this Charter to contain Paramount clause, Both-to-Blame Collision clause, General Average clause, New Jason Clause and War Risk Clause. General average, if any to be settled in accordance with York/Antwerp rules 1994. Charter hire shall not contribute to general average.

52. Charterers are to supply Owners with full style of agents at ports of call and straits before Vessel's arrival.

53. All pilotage(s) expenses to be for Charterers' account.

54. From the date of coming into force of the international safety management (ISM) code in relation to the Vessel and thereafter during the currency of this Charter, the Owners shall procure that both the Vessel and the company (as defined by the ISM code) shall comply with the requirements of the ISM code.

55. CLAUSE PARAMOUNT
CLAUSE PARAMOUNT: THIS BILL OF LADING SHALL BE DEEMED TO INCORPORATE AND BE SUBJECT TO THE CARRIAGE OF GOODS BY SEA ACT OF THE UNITED STATES OF AMERICA AND THE RULES CONTAINED IN THE SCHEDULE ANNEXED TO THE ACT EXCEPT THAT WHEN A CARRIAGE OF GOODS BY SEA ACT OR ORDINANCE OR STATUTE OF A SIMILAR NATURE TO THE "INTERNATIONAL CONVENTION FOR THE UNIFICATION OF CERTAIN RULES RELATING TO BILLS OF LADING" DATED AT BRUSSELS, AUGUST, 1924, IS ADOPTED AND COMES INTO EFFECT IN VENEZUELA THIS BILL OF LADING SHALL BE SUBJECT TO SUCH ACT OR ORDINANCE OR STATUTE AND RULES THERETO ANNEXED AND WHICHEVER IS THE APPLICABLE ACT ORDINANCE, STATUTE AND RULES IS HEREINAFTER CALLED THE CARRIAGE OF GOODS BY SEA ACT. THE VESSEL HER OWNERS, CHARTERERS, OPERATORS AND MASTER SHALL EACH BE INCLUDED IN THE TERM "CARRIER" AS USED IN THE BILL OF LADING. AT ALL TIMES WHEN CARGO IS IN THE CARRIER'S CUSTODY, THE CARRIER SHALL BE ENTITLED TO ALL RIGHTS AND IMMUNITIES AFFORDED TO CARRIERS BY THE CARRIAGE OF GOODS BY SEA ACT AND BY ANY OTHER APPLICABLE STATUTE OR RULE OF LAW FOR THE TIME BEING IN FORCE, ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING. THE CARRIER SHALL NOT BE

LIABLE IN ANY CAPACITY WHATEVER FOR ANY DELAY, NON-DELIVERY, OR MISDELIVERY OR LOSS OF OR DAMAGE TO THE CARGO OCCURRING WHILE THE CARGO IS NOT IN THE CUSTODY OF THE CARRIER. THE CARRIER SHALL HAVE THE LIBERTY TO COMPLY WITH ANY ORDERS OR DIRECTIONS OF ANY GOVERNMENT OR OF ANY PERSON PURPORTING TO ACT WITH THE AUTHORITY OF ANY GOVERNMENT.

56. General average
GENERAL AVERAGE SHALL BE ADJUSTED, STATED AND SETTLED ACCORDING TO THE YORK-ANTWERP RULES, 1974.

57. New Jason Clause
IN THE EVENT OF ACCIDENT, DANGER, DAMAGE OR DISASTER BEFORE OR AFTER COMMENCEMENT OF THE VOYAGE RESULTING FROM ANY CAUSE WHATSOEVER, WHETHER DUE TO NEGLIGENCE OR NOT, FOR WHICH SHIPPER, CONSIGNEES OR OWNERS OF THE GOODS SHALL CONTRIBUTE WITH THE OWNER IN GENERAL AVERAGE TO THE PAYMENT OF ANY SACRIFICES, LOSSES OR EXPENSES OF A GENERAL AVERAGE NATURE THAT MAY BE MADE OR INCURRED AND SHALL PAY SALVAGE AND SPECIAL CHARGES INCURRED IN RESPECT OF THE GOODS. IF A SALVING VESSEL IS OWNED OR OPERATED BY THE OWNER, SALVAGE SHALL BE PAID FOR AS FULLY AS IF SUCH SALVING VESSEL OR VESSELS BELONGED TO STRANGERS. SUCH DEPOSIT AS THE OWNER OR ITS AGENTS MAY DEEM SUFFICIENT TO COVER THE ESTIMATED CONTRIBUTION OF THE GOODS AND ANY SALVAGE AND SPECIAL CHARGES THEREON SHALL, IF REQUIRED, BE MADE BY THE GOODS, SHIPPERS, CONSIGNEES OR OWNERS OF THE GOODS TO OWNER BEFORE DELIVERY.

58. Both-to-Blame Collision Clause
IF THE VESSEL COMES INTO COLLISION WITH ANOTHER VESSEL AS A RESULT OF THE NEGLIGENCE OF THE OTHER VESSEL AND ANY ACT, NEGLECT OR DEFAULT OF THE MASTER, MARINER, PILOT OR THE SERVANTS OF THE VESSEL OR OWNERS IN THE NAVIGATION OR IN THE MANAGEMENT OF THE VESSEL, THE OWNERS OF THE GOODS CARRIED HEREUNDER WILL INDEMNIFY THE VESSEL OR OWNERS AGAINST ALL LOSS OR LIABILITY TO THE OTHER OR NON-CARRYING VESSEL OR HER OWNERS INSOFAR AS SUCH LOSS OR LIABILITY REPRESENTS LOSS OF, OR DAMAGE TO, OR ANY CLAIM WHATSOEVER OF THE OWNERS OF SAID GOODS, PAID OR PAYABLE BY THE OTHER OR NON-CARRYING VESSEL OR HER OWNERS, AS PART OF THEIR CLAIM AGAINST THE CARRYING VESSEL OR OWNER.  THE FOREGOING PROVISION SHALL ALSO APPLY WHERE THE OWNERS, OPERATORS OR THOSE IN CHARGE OF THE VESSEL OR OBJECTS OTHER THAN OR IN ADDITION TO THE COLLIDING VESSELS OR OBJECTS ARE AT FAULT IN RESPECT OF A COLLISION OR CONTACT.

60. Bulk Carrier Safety Clause

(a) The Charterers shall instruct the terminal operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter in respect to loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the Vessel in accordance with the loading/
discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(d) Compliance with the provisions of this Clause shall not affect the counting of laytime

61. Intentionally left blank.

62. Intentionally left blank.

63. Intentionally left blank.

64. Intentionally left blank.

65. Owners have the right to sell the Vessel and/or change management of the Vessel and/or change her name and/or her flag at any time during the Charter. Owners may also transfer the remaining period of the Charter to new Owners/Managers subject to Charterers' approval of new Owners/Managers which approval shall not be unreasonably withheld.

66. The crew to clean holds when and where required by Charterers provided port regulations permit. The crew to receive a lumpsum bonus payment of USD 2,500 per cleaning for this. Otherwise shore labour to be employed for Charterers' account.

67. Ship to Ship Transfer Clause for Time Charter Parties

(a) The Charterers shall have the right to order the Vessel to conduct ship to ship cargo operations, including the use of barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.

(b) The Charterers shall direct the Vessel to a safe area for the conduct of such ship to ship operations where the Vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Owners shall only provide adequate fendering, securing and mooring equipment, to the satisfaction of the Master.

(c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the Vessel or to remove the Vessel.

(e) Owners shall provide additional premium quotation, if any, prior to the Ship to Ship Operations, subject to Charterers' approval.  If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred.

(f) To the extent not covered by Owners' insurance, the Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the Vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, or barges; loss of or damage to cargo; and pollution.

68. Notices
Unless otherwise expressly provided for in the Charter, any notice, request or demand by the Owners or the Charterers shall be given in writing in English and shall be deemed to be sufficiently given if delivered by hand or by sending the same by registered post (postage paid) or delivering it to or by sending it by fax to the address or fax numbers of the party concerned as set out below.

      (a)    Owners:
             Gretchen Shipping, Inc.
             C/o Kyma Ship Management Inc
             1015 North America Way – Suite #128
             Miami
             Florida 33132
             USA
             Mr. Lambros Katsoufis – President
             Telephone:    +1 305 376 8605
             Facsimile:    +1 305 376 4375
             e-mail: lkatsoufis@kymaship.com

      (b)    Charterers:
             Commodities Minerals Enterprise, Ltd.
             501 Brickell Key Dr., Suite 502
             Miami, FL 33131
             Mr. Tyrone Serrao

Phone: +1.305.375.0632
Fax: +1.305.375.0634
Email: ts@cmeltd.com

69. Confidentiality

For the duration of the Charter, Owners and Charterers will keep in strict confidence and will not disclose any confidential or proprietary information relating to the Charter, to any person or entity, or make use of any such confidential or proprietary information for its own purposes or for the benefit of any person or entity, except as may be necessary in the ordinary course of performing its respective duties, pursuant to the Charter.

FOR THE OWNERS                     FOR THE CHARTERERS

*[signature]*                      *[signature]*
                                   01-25-10
Secretary
Gretchen Shipping Inc.

Addendum No. 1 to Charterparty
Dated January 29th, 2010

This is an addendum to the Charter Agreement signed on the 2̶5̶th [29] day of January 2010 (referred to as "the Charter") entered into between Commodities and Minerals Enterprise Ltd., (the "Charterers") and Gretchen Shipping Inc., (the "Owners").

Words and expression defined in the Charter shall have the same meanings when used herein.

1.  By mutual agreement between the Owners and the Charterers, the original versions of the following clauses as set out in the Charter shall be deemed to be deleted and substituted by the following clauses ab initio:

    16  Time of delivery
    Between 2/10/2010 - 02/22/2010 unless otherwise agreed.

2.  All other terms and conditions of the Charter shall remain unamended and in full force and effect.

3.  This Addendum may be executed in any number of counterparts each of which shall be original but which shall together constitute the same instrument.

4.  This Addendum shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States.

Dated this 29th day of January, 2010

Executed by                                      Executed by

Mr. Lambros Katsoulis                            Mr. Tyrone Serrao
For and on behalf of                             For and on behalf of
Gretchen Shipping Inc.                           Commodities and Minerals Enterprise Ltd..
                                                 02/02/10

<u>Addendum No. 2 to Charterparty</u>
<u>Dated February 9th, 2011</u>

      This Addendum No. 2 dated February 9, 2011 is in respect to the Charter Agreement dated January 25, 2010 (referred to as "the Charter") entered into between Commodities and Minerals Enterprise Ltd., (the "Charterers") and Gretchen Shipping Inc., (the "Owners"). The Charter Agreement has heretofore been amended by Addendum No. One dated January 29, 2010 and is now further amended by the provisions of this Addendum No. Two.

Words and expression defined in the Charter shall have the same meanings when used herein.

1.     By mutual agreement between the Owners and the Charterers, the original versions of the following clauses as set out in the Charter shall be deemed to be deleted and substituted by the following clauses ab initio:

          Clause 20 Line 293:
          Charterers and Owners acknowledge that Venezuela is currently an Additional War Risk Area. For the 2010 year, Charterers shall contribute $15,000 towards the payment of any Additional War Risk Insurance Premium of any nature whatsoever. Thereafter and for the remainder of the charter, Charterers and Owners shall equally share the cost for any Additional War Risk Insurance Premium of any nature whatsoever i.e. 50/50, upon presentation of Owners' Insurers' official vouchers. Charterers have the right to source alternate insurance cover for such additional war risks and Owners shall insure the Vessel with satisfactory insurance cover at the rates most beneficial to both parties.

2.     All other terms and conditions of the Charter shall remain unamended and in full force and effect.

3.     This Addendum may be executed in any number of counterparts each of which shall be original but which shall together constitute the same instrument.

4.     This Addendum shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States.

          Dated this 9th day of February, 2011

Executed by                         Executed by

_____        _____
Mr. Lambros Katsoufis           Mr. Tyrone Serrao
For and on behalf of            For and on behalf of
Gretchen Shipping Inc.         Commodities and Minerals Enterprise Ltd.,

# EXHIBIT 2

REDACTED

**From:** Paris Katsoufis <pkatsoufis@mac.com>
**Subject: Re: m.v Christoffer Oldendorff visit l2/9/09**
**Date:** December 11, 2009 11:43:10 AM EST
**To:** Stefanos Skyriotis <sskyriotis@kymaship.com>, George Katsoufis
<gkatsoufis@kymaship.com>, Mark Davis <mdavis@kymaship.com>, Lambros Katsoufis
<lkatsoufis@kymaship.com>
**Cc:** Arturo Contreras <ac@cmeltd.com>, Tyrone Serrao <ts@cmeltd.com>


Dear All,

On Dec 9,2009 Arturo and I visited the captioned vessel,lying at the Blount Island marine terminal of the port of Jacksonville.

The vessel was unloading abt 40,000 tons of coal from Colombia.
We followed the discharging operation steps throughout the vessel with the guidance of Ch.Mate capt.  Ravil Aksyanov( a very well versed to the operation  Russian officer) who  answered all our questions.
This is a very well thought design which enables the vessel to discharge abt 4,500 M/T iron ore or 4,400 M/T of coal per hour.The operation was seamless and fast without almost any trace of dust or spill over.
This is  a vessel  inside the old vessel which has 222 hydraulic basket gates feeding 3 hold conveyors of 1500 MT max handling capacity each per hour.The three conveyors feed the boom conveyor capable of unloading the quantities mentioned  above. The bottom of  of the holds is constructed wavy like a hopper, therefore the cargo slides down to the conveyors. In the unlikely event that moisture will stick the cargo not allowing it  to slide down easily, they have added 151 hydraulic vibrators attached to the under side of  the hopper-like bottom of the holds,guaranteeing the complete discharge of the cargo.

1

The vessel's characteristics and her vital statistics are as attached.

The condition of the vessel was much better than her age implies. The engine room was very clean ,her bilges were very clean,probably the cleanest bilges of any ship I have seen. The reason for such a condition should be sought to the fact that the owners are a German company,the vessel visits very often the United States and therefore is" under the gun" of U.S. Coast Guard and more importantly the crew is serving onboard for many years.the Chief Engineer Mr.Marek Golanko from Poland is with the company for 15 years.He is proud of his engines and takes special care of them and it shows.

The vessel is equipped with 5 generators that are used for both the vessel and the self unloading system. The F.O for the M.E is 380 CST while the generators are consuming Marine Diesel. The consumption for the M.E at Sea is abt 37 tons HFO and 3,3 MT D.O, while in port, with the whole system fully operative the consumption 7,5 MT.

The incinerator is capable of burning sludge and therefore they do not need to unload anything ashore including garbage.

The fresh water generator is of the vacuum type using the jacket cooling water. Its capacity is not more than 16 tons a day. The C.E when asked what he would need to have in this ship he said another water evaporator or reverse Osmosis since the quantity produced is not enough to take care of all the requirements. They wash the conveyors and the boom with fresh water whenever they change cargo as this time they may load salt.

The vessel is equipped with a KAMEWA bow thruster of 1400 BHP,which makes the berthing operation safer, easier and less expensive.

The Engine room is of the unmanned configuration but the C.E has a motorman at night on watch for safety reasons. They had probably an accident and decided to be at the safe side.

The C.E did not report any problem in the Engine room,which I find rather strange considering the age of the vessel.He may be telling the truth.

The upper deck is well painted and seems to be well maintained for a vessel of 27 years of age. to the contrary,the condition of the inner spaces, holds, conveyors ,Hydraulic basket gates,hold stair cases etc needs better maintenance.

The vessel has a crew or 35 crew members since at least 10 crew members are involved in the operation and maintenance of the unloading system. Recently they released the Chief Mate of watch duties and they have added a 2nd officer for the Chief mates watch.
The hatch covers are side sliding hydraulically.

The vessel was, last year, in drydock or wet dock for 3 months or so the Captain advised us. The reason, of this long out of service period,was the age of the vessel and the sensitivity of the authorities to overaged vessels.One LLoyd's surveyor was onboard for the whole duration indicating continuously areas of concern and required repairs.
This is the reason that I am of the opinion to try and buy her" as is" and take her to the dry dock to complete her special survey which is due in March latest,or all the items of the Continuous Machinery survey which are due either in Feb or Sept.2010 .
The Master,Capt Sergiy Rulevsky ,a Ukranian, was very knowledgeable of his business but he denied to work for us in case we were to buy this vessel.

I believe that this is a good tool under the circumstances.

The high amount of insurance premium quoted  is of concern but we hope that the underwriters after they inspect the vessel they will reaffirm my opinion on vessel's condition and they will reduce their demands swayed in a way by our good record.

Additionally ,of concern is the state of affairs in Venezuela and the unilateral decisions of its government. I plan to discuss this with our charterers and take a common course of action.


Best Regards
Paris Katsoufis



# Vessel's Particulars
Reference: ER-Part-09

**Oldendorff Carriers**

| Name of Vessel | Official No. | Call Sign | IMO Number |
|---|---|---|---|
| CHRISTOFFER OLDENDORFF | 90340 | ELXC8 | 8011782 |

| Flag | Port of Registry | Classification | Classification Number |
|---|---|---|---|
| LIBERIA | MONROVIA | LLOYD'S REGISTER OF SHIPPING | 8011782 |

| Owner | Manager/ Operator | Character of Class | |
|---|---|---|---|
| | | **Hull** | **Machinery** |
| OLDENDORFF CARRIERS GmbH & Co. KG | CSL INTERNATIONAL / ARUBA MARITIME INC. | + 100A1 ESP LI | + LMC UMS |

| Type of Vessel | Year, Number of Built | Yard of Built |
|---|---|---|
| SELF-UNLOADING BULK CARRIER | 1982/NO. 253 1988 (CONVERTED) | GOVAN SHIPBUILDERS LTD. GLASGOW SCOTLAND VEROLME ESTALEIROS REUNIDOS RIO DE JANEIRO BRAZIL |

| Length o.a. | Length b.p. | Beam | Depth moulded | max. Draft |
|---|---|---|---|---|
| 227.73 m (747'02") | 214.50 m (703'09") | 32.23 m (105'09") | 19247 m (63'02") | 13.488 m summer (44'03") |

| Freeboard | Masthead Height a. Keel | Gross Tonnage | Net Tonnage |
|---|---|---|---|
| 5.759 m (summer) | 48.7 m (159'09")above BL | 37,959 MT | 16,733 MT |

| Deadweight | Light Ship | Displacement | Holds | Crew |
|---|---|---|---|---|
| 62,594 mt (summer) | 16,348 mt | 78,942 mt (summer) | 7 | 36 |

| Below Deck | Container On Deck | Reefer | Loading Capacity | |
|---|---|---|---|---|
| | | | **Grain** | **Bale** |
| N/A TEU | N/A TEU | N/A TEU | 59,703.6 cbm (2,108,412 cft) | 57,899.8 Cbm (2,044,712 cft) |

| Main Engines | | Aux. Generator Diesels | |
|---|---|---|---|
| **Number, Output** | **Type** | **Number, Output** | **Type** |
| (1) Engine  15,400 BHP (11,400 Kw) | B & W 5l 80GFCA | 3 X 880 Kw 2 X 625 Kw | ALLEN S12F-HBC YANMAR 6GL-UT |

| Propeller | | Shaft Generator | |
|---|---|---|---|
| **Number, Type** | **Diameter** | **Number, Output** | **Type** |
| NIKALIUM FIXED 4 BLADE RIGHT HANDED | DIAMETER6.80 m PITCH 4.62 m | N/A | N/A |

| Bow Thruster | | Speed | |
|---|---|---|---|
| **Number, Output** | **Type** | **Service** | **Maximum** |
| 1,400 BHP | KAMEWA TT 2000 F/BMS-CP | 13.5 kn | 14.5 kn |

## Nautical Equipment

| | |
|---|---|
| 1 X- BAND RADAR TOKIMEC BR-340 MA-X27 | 2 VHF  Sailor  C403 |
| 1 S- BAND RADAR TOKIMEC BR-3440 MA-S314 | 2 VHF Sailor  RM 2048 |
| 1 GYRO COMPASS SPERRY MK-37 / AUTO PILOT | 2 VHF DSC Sailor 2042 |
| 1 MAGNET COMPASS SESTREL 90624 | 1 HF SSB/ DSC Station Furuno FS2571-C |
| 1 GPS FURUNO GP-90 | 1 RADIO TELEX TERMINAL Furuno IB583 |
| 1 GPS FURUNO GP- 80 | 1 INMARSAT –C  TERMINAL SAILOR |
| 1 AIS UNIT Furuno FA- 100 | 1 INMARSAT- B Terminal Nera ( Saturn B ) |
| 1 SPEED LOG FURUNO DS-80 | 1 GYRO DIGITAL REPEATER  AD converter AD 100 |
| 1 WEATHER FACSIMILE FURUNO FAX-207 | 1 CHARTCO |
| 1 NAVTEX-2 LO-KATA | 1 SVDR Rutter Canada |
| 1 COURSE RECORDER TOKIMEC CR - 2 | MMSI  636090340 |
| 1 CHRONOMETER KELVIN HUGHES | Mini-C Sailor TT-3000LRIT |
| 1 ECHO SOUNDER SIMRAD ED 161 | Inmarsat C: Telex: 4636 37010, |
| | C- email: 463637010@stratosmobile.net |
| | Inmarsat B:  Tel.: + 3636 17410,  3636 17411 |
| | Fax:  + 3636 17420 |
| | E-mail: christoffer.oldendorff@gtships.com |



| **Vessel's Particulars** | Oldendorff Carriers |
| :---: | :---: |
| Reference: ER-Part-09 | |

---

### Miscellaneous
e.g. Grain Capacity cbm, Reefer Capacity cbf, Dangerous Goods, Elevators, Shell Doors, Cargo Gear, Cranes, Selfunloader, Fork Lifts,

### Self-unloading Bulk Carrier

1. *Hydraulic Basket Gates- 222 pcs. Under hoper openings 630X1900mm*

2. *Hydraulic Vibrators –151 pcs. Max.centrifugal force: 1,360 kp,4,200 r/m*

3. *Hold Conveyors: max handling capacity 1500 MT(iron ore) or 1,500 cu. M. (coal) each belt-width 2,200 mm, conveyor length169 m,lifting height 4200 mm, min./max. belt speed 0.32/ 1.77 m/s, power req.: on pulley shaft 62.5 kW.*

4. *2 Cross Conveyors: max. Handling Capacity 1,500 MT (iron Ore) Or 1,500 Cu. M. (coal) each belt –width 1,800 mm, conveyor length 5.4 m. min. / max. belt speed 0.4 / 2.1 m/s, power req.: on pulley shaft 4.3 kW.*

5. *2 Flexo-Lift Inner Conveyors: max. handling capacity 2,250 MT (iron ore) or 2,200 cu. M. (coal) each belt –width 2,000 mmm., effective carry width 1,000 mm, height sidewalls 500 mm lifting height 31.7 m, min. / max. belt speed 2.0/3.5 m/s, power req.: on pulley shaft 262.62 kW.*

6. *1 Inboard and 1 Outboard Boom Conveyor: max. handling capacity 4,500 MT (iron ore) or 4,400 cu. m. (coal), conveyor length: Inboard boom 46.2 m, Outboard Boom 31.8 m, Luffing range:18deg. Min /max belt speed 2.5 / 4.8 m/s, Luffing speed:18 deg/10 min. Inboard Boom and 18deg./5 min Outboard Boom.,power req.: on Pulley shaft 210.5 kW Inboard Boom and 158.8 kW Outboard Boom.*

### Cargo Hold Capacity

| | **Hold and Hatches** | | **Holds** | |
| :--- | :--- | :--- | :--- | :--- |
| Hold #1 | 7,333.7 cu. m. | 259,001 cu. ft. | 7,123.8 cu. m. | 251,588 cu. ft |
| Hold #2 | 9,517.7 cu. m. | 336,133 cu. ft. | 9,223.7 cu. m. | 325,750 cu. ft. |
| Hold #3 | 9,571.4 cu. m. | 338,029 cu. ft. | 9,277.3 cu. m. | 327,643 cu. ft. |
| Hold #4 | 9,314.8 cu. m. | 328,967 cu. ft. | 9,020.7 cu. m. | 318,580 cu. ft. |
| Hold #5 | 9,235.7 cu. m. | 326,174 cu. ft. | 8,941.6 cu. m. | 315,787 cu. ft. |
| Hold #6 | 9,517.7 cu. m. | 336,133 cu. ft | 9,223.6 cu. m. | 325,746 cu. ft. |
| Hold #7 | 5,212.6 cu. m. | 184,091 cu. ft. | 5,139.1 cu. m. | 181,496 cu. ft. |
| Total: | 59,703.6 cu. m. | 2,108,528 cu. ft | 57,949.8 cu. m. | 2,046,590 cu. ft. |

### Class Notification:

   **+100A1 Bulk Carrier**
       **Self-Unloading**
       **Strengthened for heavy cargoes,**
       **Nos. 1,3,5 and 7 holds or Nos. 2,4 and 6 holds may be empty at a draft not exceeding 10.4 meters.**
       **Cargo in Holds 1,2,3,4,5,6 and 7 not to exceed 9,100/11,600/11,600/11,300/ 11,200/11,600 and 7,500 tonnes respectively.**
       **ESP LI**
   **+LMC UMS**

*This information provided in this QSE form is believed to be correct but we do not guarantee its completeness or accuracy.*

| Date: | Signature Master: |
| :--- | :--- |
| 08.12.2009 | M/V Christoffer Oldendorff |
| | Aruba Maritime Inc. |
| | Monrovia/Liberia |

| Fo-GO-11a | Revision 10 | 01.10.2007 | Filing: ER-Manual Part 9 | Page 2 of 2 |

REDACTED

**De:** Paris Katsoufis <pkatsoufis@me.com>
**Asunto: Re: Inspeccion de Buque de Acarreo - I: Report veloce Cristoffer oldendorf**
**Fecha:** 21 de diciembre de 2009 1:38:26 p.m. GMT-05:00
**Para:** Tyrone Serrao <ts@cmeltd.com>
**Cc:** Arturo Contreras <ac@cmeltd.com>, Gerardo Vasquez <gv@gvazquez.com>, George Katsoufis <gkatsoufis@kymaship.com>, Stefanos Skyriotis <sskyriotis@kymaship.com>, Lambros Katsoufis <lkatsoufis@kymaship.com>


Dear Tyrone:
Many thanks for your today's message.
I have requested our office in Greece to properly translate this report which is in italian.
From what I can understand with my poor italian the writer is reporting points that appear in vessel's Lloyds latest condition report,which we had acquired from the Captain on our latest visit in Jacksonville  and we had seen ourselves judging from the photos submitted..
We know almost exactly the condition since we have discussed with Lloyds and we have seen vessel's complete records.
Subject to further surveys and thickness determination to be taken before delivery of the vessel ,we plan to take the vessel in Dry-dock and deal with all conditions as needed.I have in mind to have the vessel at your disposal after dry dock  complying with all the present and 2010 Lloyds memoranda cleared.
If everything is as it appears in the records,I expect that the vessel will be at your disposal mid to end February. I do not want after we start to have stoppages for emergency repairs or imminent class requirements.
Is this unacceptable to you?
We hope latest to day to send you the draft  Time Charter.
Best regards
Paris Katsoufis
Kyma Ship Management Inc
(as Agents)

On Dec 21, 2009, at 12:30 PM, Tyrone Serrao wrote:


Dear Paris,
We have made some additional investigation and found a report and some pictures taken to MV Cristoffer Oldendorf, during a recent inspection.
Please have a look at it and revert with your  opinion.

Please handle this information in a confidential way.

Based on our discussions being carried on,  and you can manage to get over the circumstances mentioned in the report,  we shall require this vsl for shuttle operation as soon as possible.

Best regards

Tyrone Serrao
President


<pastedGraphic.tiff>

**Commodities & Minerals Enterprise LTD**
501 Brickell Key Drive
Suite 502
Miami Fl 33131
Office +1 305.375.0632
GSM USA +1 305.450.4782
GSM VZLA +58 4143860759
E-Mail ts@cmeltd.com
http://www.cmeltd.com


Subject:   report veloce Cristoffer oldendorf

la nave  ha delle raccomandazioni, fatte dai lloyd, dove ci sono delle zone sospette, che bisogna controllare ogni anno con tickness.
Io ho visitato ganone prua,gavone poppa, 1 sinistra e 6 dritta.Un po di ferro si deve fare solo nel gavone, ma non molto.
Fino ad oggi, penso che ai lavori, hanno spesso cambiato ferro, ma non hanno mai messo mano ala struttura del sistema di discarica.
Come vedi da foto, la nave nella stiva ha tanti imbuti, che attraverso una apertura idraulica di una flap, scarica su un nastro, localizzato sotto la stiva, in un tunnel.
ogni stiva ha tre file di imbuti , una centrale, una laterale dritta, una laterale sinistra, con conseguente tre belt da trasporto nel tunnel una centrale,
una laterale dritta e una laterale sinistra.
Sia le flap, sia la parte bassa dell'imbuto, sia i pistoni idraulici che comandano apertura e chiusura flap imbuto, sia la base del pistone idraulico , in molti
ma dico molti imbuti e da tagliare, rinnovare ,o insertare, in piu al momento parecchi rulli trasportatori non girano, cosi come anche dei supporti dei rulli , sono marci e bisogna insertare . Su tutte le flap che scaricano sul nastro nel tunnel, la chiusura di sicurezza manuale e completamente off, bisogna solo tagliare e ripristinare.vedi foto.
Questo mi sembra un lavoro lungo e costoso da fare.La nave ultimo bacino fatto dic.2008, e' stata tre mesi e mezzo ai lavori.

La nave e' composta di un equipaggio di 35 persone, durante la discarica, due persone devono stare nel tunnel, due persone in coperta tra scala e cavi,

un ufficiale sta nella cargo contro room, per fare zavorra e scaricazione.
Il sistema e' controllato dal direttore di macchina e un elettricista, che stanno su questa nave da piu di tre anni, facendo tre mesi on tre off(incluso comandante)
che prima faceva 1 uff.le su questa nave, e due operai coperta, che lavorano come manutenzionatori del sistema.
La nave ha 5 generatori a gasolio, (tre per il sistema e due per la nave)
In porto ne usano 4 di generatori, quando scaricano , con consumo di 7,5 ton.di gasolio
In navigazione due generatori , con cosumo totale di 3.3 di gasolio , piu 34 tonnellato di Fuel
Il primo ufficiale, mi dice che tutte le volte che vanno a caricare all'ancora , , quando mettono il braccio fuori lateralmente, per poter aprire le stive senza problema,
lo rizzano con 4 cavi di ormeggio, due da un lato e due dall'altro , in quanto le rollate possono danneggiare il sistema girevole del braccio.Questo fatto mi insospettisce sempre di piu , al riguardo di dove scaricare se si rolla . Io domani mi faccio dare copia istruzioni, e vedo un po se dice qualche cosa.
Al momento oltre al fatto che ha una botticina di poppa,(vedi foto) non ho altro.
Saluti


Al momento questo e tutto, domani, do sguardo alle stive che oggi erano piene, e ai certificati


Le tue foto online: crea il tuo album e tagga gli amici(See attached file: SurveyReport2411090732118011782[1].pdf)(See attached file: imbuti nella stiva.JPG)(See attached file: fondo imbuto nel tunnel.JPG)(See attached file: imbuto aperto che sta scaricando.JPG)(See attached file: marciume sotto imbuto.JPG)(See attached file: stopper a imbuto che non si puo pi mettere, tutto arruginito.JPG)
(See attached file: pistone.JPG)(See attached file: pistone con base marcia.JPG)(See attached file: chiusura non stagna dell'imbuto nel tunnel,stiva gia scaricata.JPG)(See attached file: braccio parte iniziale.JPG)(See attached file: braccio parte finale.JPG)(See attached file: mariume sotto imbuto in tunnel 1.JPG)(See attached file: IMGP3182.JPG)

CONFIDENTIALITY AND DISCLAIMER NOTICE
The information in this e-mail (including all attachments) is confidential and may be legally privileged. It is intended only for the use of the addressee and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.
If you have received this e-mail in error, please notify us immediately by return e-mail to the original sender and delete this e-mail and all attachments from your system. Any views or opinions presented are solely those of the sender and do not represent those of Duferco unless otherwise specifically stated. Duferco does not accept either legal responsibility for the contents of this message or responsibility for any changes made after being sent. You are advised to carry out a virus check before opening any attachment, Duferco does not accept liability for any damage sustained as a result of any software viruses. Please be aware that Duferco reserves the right to read all incoming and outgoing e-mails.


<imbuti nella stiva.JPG>
<fondo imbuto nel tunnel.JPG>
<imbuto aperto che sta scaricando.JPG>

&lt;marciume sotto imbuto.JPG&gt;
&lt;stopper a imbuto che non si puo pi mettere, tutto arruginito.JPG&gt;
&lt;pistone.JPG&gt;
&lt;pistone con base marcia.JPG&gt;
&lt;chiusura non stagna dell'imbuto nel tunnel,stiva gia scaricata.JPG&gt;
&lt;braccio parte iniziale.JPG&gt;
&lt;braccio parte finale.JPG&gt;
&lt;mariume sotto imbuto in tunnel 1.JPG&gt;
&lt;IMGP3182.JPG&gt;
&lt;SurveyReport2411090732118011782[1].pdf&gt;

# **EXHIBIT 3**



**WESTERN UNION**
business solutions
Custom House (USA) Ltd

Contact name: Farid Galia
Transaction date: Sep. 07, 2012

Kyma Ship Management Inc
1015 North America Way, Suite- 128
Miami, FL 33132
UNITED STATES

Tel: 305-376-8600
Fax: 305-376-4375

702 - US Trading Office
330 Bay Street, Suite 300
Toronto, ON M5H 2S8
CANADA

Tel: 1-866-344-4583
Fax: 1-877-442-2481

IMPORTANT: Please make your payments payable to Custom House and include Order ID 36447019 as the reference for your payment.

## Order summary

Order ID: 36447019

| Beneficiary name | FX Currency | FX amount | Contract ID | Rate | Settlement amount | S/C | Total amount |
|---|---|---|---|---|---|---|---|
| Kyma Ship Management, Inc | USD | 30,000.00 | | 1.0000 | 30,000.00 | 7.50 | 30,007.50 |
| | | 30,000.00 | Spot | 1.0000 | | | 30,000.00 |
| VIPSEN CORP | USD | 4,986.92 | | 1.0000 | 4,986.92 | 7.50 | 4,994.42 |
| | | 4,986.92 | Spot | 1.0000 | | | 4,986.92 |
| GERARDO A. VAZQUEZ, P.A. D/B/A VAZQUEZ & ASSOCIATES | USD | 4,986.92 | | 1.0000 | 4,986.92 | 7.50 | 4,994.42 |
| | | 4,986.92 | Spot | 1.0000 | | | 4,986.92 |
| Praxis Energy Agents LLC | USD | 94,136.00 | | 1.0000 | 94,136.00 | 7.50 | 94,148.50 |
| | | 94,136.00 | Spot | 1.0000 | | | 94,136.00 |
| **Totals (USD):** | | | | | 134,109.84 | 30.00 | 134,139.84 |

+ $925.93
$ 140,065.77

## Item summary

| Item ID | Direction | Currency | Method | FX amount | Beneficiary details |
|---|---|---|---|---|---|
| 35447021 | Buy | USD | Wire | 30,000.00 | Kyma Ship Management, Inc |

| | |
|---|---|
| Address: | 1801 SW 3rd Ave., Suite 200, MIAMI, FL 33129, UNITED STATES |
| Bank name: | Northern Trust National Bank |
| Bank address: | 700 Brickell Ave., Miami, FL 33129, UNITED STATES |
| Swift code: | CNORUS3M |
| Bank code: | |
| Account No: | REDACTED |
| Reference: | Kyma Ship Management Inc |

OCT - 4 2012

GSI000289



**business solutions**
Custom House (USA) Ltd

Contact name: Mark Davis
Transaction date: Jun. 25, 2012

**Kyma Ship Management Inc**
1015 North America Way, Suite- 128
Miami, FL 33132
UNITED STATES

Tel:  305-376-8600
Fax:  305-376-4375

**702 - US Trading Office**
330 Bay Street, Suite 300
Toronto, ON M5H 2S8
CANADA

Tel: 1-866-344-4583
Fax: 1-877-442-2481

**IMPORTANT: Please make your payments payable to Custom House and include Order ID 34678108 as the reference for your payment.**

## Order summary

**Order ID: 34678108**

| Beneficiary name | FX Currency | FX amount | Contract ID | Rate | Settlement amount | S/C | Total amount |
|---|---|---|---|---|---|---|---|
| Praxis Energy Agents LLC | USD | 451,224.11 | | 1.0000 | 451,224.11 | 7.50 | 451,231.61 |
| | | 451,224.11 | Spot | 1.0000 | | | 451,224.11 |
| SULEID GIRALDO HERRERA | USD | 11,047.46 | | 1.0000 | 11,047.46 | 7.50 | 11,054.96 |
| | | 11,047.46 | Spot | 1.0000 | | | 11,047.46 |
| VIPSEN CORP | USD | 791.03 | | 1.0000 | 791.03 | 7.50 | 798.53 |
| | | 791.03 | Spot | 1.0000 | | | 791.03 |
| GERARDO A. VAZQUEZ, P A  D/B/A VAZQUEZ & ASSOCIATES | USD | 791.03 | | 1.0000 | 791.03 | 7.50 | 798.53 |
| | | 791.03 | Spot | 1.0000 | | | 791.03 |
| Scardana Corporation | USD | 9,442.10 | | 1.0000 | 9,442.10 | 7.50 | 9,449.60 |
| | | 9,442.10 | Spot | 1.0000 | | | 9,442.10 |
| Triadafilos Kalkanis | USD | 22,810.63 | | 1.0000 | 22,810.63 | 7.50 | 22,818.13 |
| | | 22,810.63 | Spot | 1.0000 | | | 22,810.63 |
| Taylor Wessing | EUR | 1,122.60 | | 1.2625 | 1,417.28 | 0.00 | 1,417.28 |
| | | 1,122.60 | Spot | 1.2625 | | | 1,417.28 |
| Skandiaverken Ltd | EUR | 3,140.23 | | 1.2625 | 3,964.54 | 0.00 | 3,964.54 |
| | | 3,140.23 | Spot | 1.2625 | | | 3,964.54 |
| | Totals (USD): | | | | 501,488.18 | 45.00 | 501,533.18 |

JUL - 3 2012

## Item summary

| Item ID | Direction | Currency | Method | FX amount | Beneficiary details |
|---|---|---|---|---|---|

GSI000281

# **EXHIBIT 4**

# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

**Previous on List**   **Next on List**

Partnership Name Search

[Submit]

## Partnership Name List

| Partner Name | Type | Status |
|---|---|---|
| VIABLE BIO DISCOVERIES AND SOLUTIONS, LLC | REG | ACTIVE |
| VIA CLEANING SERVICES | REG | ACTIVE |
| VIA CRISTALINA | REG | ACTIVE |
| VIANALE & VIANALE LLP | REG | ACTIVE |
| VIANALE & VIANALE LLP | LLP | ACTIVE |
| VIAN ASSOCIATES | REG | ACTIVE |
| VICK ENTERPRISES | REG | ACTIVE |
| VICKERS MADSEN & GOLDMAN, LLP | LLP | INACT/EXPIRED |
| VICKERS MADSEN & GOLDMAN, LLP | LLP | NAME HS |
| VIC AND SUE FLORIDA CONDO RENTAL | REG | ACTIVE |
| VICTORIA INVESTMENT PARTNERS | REG | INACT/DISSOLVED |
| VICTORIA PARK COMPUTER MAINTENENCE & REPAIR | REG | ACTIVE |
| VICTORIA ROSE GIFT COMPANY | REG | ACTIVE |
| VICTORIA STATION, LLP | REG | ACTIVE |
| VICTORIA STATION, LLP | LLP | INACT/REVOKED |
| VICTOR KOWAL FINE ART GALLERY | REG | INACT/CANCELLED |
| VICTORY ART AND DESIGN | REG | INACT/DISSOLVED |
| VICTORY TRADING COMPANY | REG | ACTIVE |
| VICTORY WIRELESS, L.L.P. | REG | ACTIVE |
| VICTORY WIRELESS, L.L.P. | LLP | INACT/REVOKED |

**Previous on List**   **Next on List**

Partnership Name Search

[Submit]

| Home | Contact us | Document Searches | E-Filing Services | Forms | Help |

Copyright © and Privacy Policies
State of Florida, Department of State

# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Next List

Entity Name Search

[ Search ]

## Entity Name List

| Corporate Name | Document Number | Status |
| --- | --- | --- |
| V&H VENTURES LLC | L13000116353 | Active |
| V. H. V. H., INC. | 528655 | INACT |
| VHV HOLDINGS, LLC | L11000000168 | Active |
| VHVIDEO.COM, INC | P06000085405 | Active |
| VHV NATURAL STONE CORPORATION | P05000100058 | INACT |
| VHV PARTNERS, LLC | L13000096176 | Active |
| VHV VICTIMS HELPING VICTIMS CORP. | N01000003095 | INACT |
| V. H.W. INC. | F00482 | Active |
| V. & H. WELDING, INC. | G02432 | INACT |
| VHW HEALTH, LLC | L12000155562 | Active |
| V H W INVESTMENT, INC. | P04000129420 | Active |
| V. H. W. PROPERTIES, INC. | P94000010293 | INACT |
| THE VHY CREATIVE SOLUTIONS , LLC | L11000118130 | NAME HS |
| THE VHY INVESTMENT PLUS, LLC | L11000114047 | NAME HS |
| V & I COMPANY INC | 131254 | INACT |
| V I INC | 132925 | INACT |
| VI, INC. | 553672 | NAME HS |
| VI LTD. LIMITED PARTNERSHIP | B07000000182 | Active |
| V & I, L.L.C. | L05000019152 | Active |
| V.I. INC. | L69539 | INACT |

Next List

Entity Name Search

[ Search ]

# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |
|------|-----------|-------------------|-------------------|-------|------|

Previous List    Next List

Fictitious Name Search

[Submit]

## Fictitious Name List

| Fictitious Name | Address | City | State | County | Status |
|-----------------|---------|------|-------|--------|--------|
| VHVF TUTORING EDUCATIONAL SERVICES | 861 NW 70 WAY | MARGATE | FL | BROWARD | A |
| VH VIDEO PRODUCTIONS | 4111 LAND O'LAKES BLVD | LAND O'LAKES | FL | PASCO | E |
| VHV NATURAL STONE | 7135 YACHT BASIN AV | ORLANDO | FL | ORANGE | E |
| VHV NATURAL STONE | 7135 YACHT BASIN AV. #212 | ORLANDO | FL | MULTIPLE | A |
| VHV NATURAL STONE | 7135 YACHT BASIN AVENUE APT. 212 | ORLANDO | FL | MULTIPLE | V |
| VHY'S HOME HEALTH SERVICE | 408 17TH ST | WEST PALM BEACH | FL | PALM BEACH | E |
| VI | 71 SOUTH WACKER DRIVE | CHICAGO | IL | MULTIPLE | A |
| VI360.COM OF TAMPA | 201 WILDMERE ROAD | ROCHESTER | NY | MULTIPLE | E |
| VI 3 DISTRIBUTING COMPANY | 7010 NW 186TH ST. #411 | MIAMI | FL | MIAMI-DADE | E |
| VIA | 18555 COLLINS AVE #264 | SUNNY ISLES BEACH | FL | PALM BEACH | A |
| VIA | 1931 NW 150TH AVE | PEMBROKE PINES | FL | MULTIPLE | A |
| VIA | 3300 NE 192ND STREET #907 | AVENTURA | FL | MULTIPLE | A |
| VIA | 877 16TH AVENUE NORTH | ST PETERSBURG | FL | PINELLAS | E |
| VIA 207 | 1421 SW 107 AVE #179 | MIAMI | FL | MULTIPLE | A |
| VIA 305 PRODUCTIONS | 4700 BISCAYNE BLVD | MIAMI | FL | MULTIPLE | A |
| VIA.3D. INCORPORATED | 10242 NW 47TH STREET | SUNRISE | FL | BROWARD | E |
| VIA ADDISON | 3065 ST. JAMES DRIVE | BOCA RATON | FL | PALM BEACH | E |
| VIA AEREA | 10211 WEST SAMPLE ROAD SUITE 117 | CORAL SPRINGS | FL | BROWARD | C |
| VIAA EVENTS & SERVICES | 1734 BLOSSOMWOOD | ORLANDO | FL | ORANGE | E |
| VIA AL EXITO | 1726 WOOLCO WAY | ORLANDO | FL | ORANGE | A |

Previous List    Next List

Fictitious Name Search

[Submit]

Copyright © and Privacy Policies
State of Florida, Department of State

# <u>EXHIBIT 5</u>

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L13000116353
FILED 8:00 AM
August 16, 2013
Sec. Of State
jbryan

## Article I

The name of the Limited Liability Company is:

V&H VENTURES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

30 GARFIELD PLACE
1040
CINCINNATI, OH. US  45202

The mailing address of the Limited Liability Company is:

30 GARFIELD PLACE
1040
CINCINNATI, OH. US  45202

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

BENJAMIN R GETTLER
1020 PONCE DE LEON DR.
FT LAUDERDALE, FL.  33316

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   BENJAMIN R. GETTLER

## Article V

The name and address of managing members/managers are:

L13000116353
FILED 8:00 AM
August 16, 2013
Sec. Of State
jbryan

Title:  MGR
BENJAMIN R GETTLER
1020 PONCE DE LEON DR.
FT LAUDERDALE, FL.  33316  US

Title:  P
GARRICK  HART
6278 NORTH FEDERAL HIGHWAY
FT LAUDERDDALE, FL.  33308  US

Title:  SVP
MICHAEL  HART
6278 NORTH FEDERAL HIGHWAY
FT LAUDERDALE, FL.  33308  US

Title:  VP
JOHN F GABRIEL
30 GARFIELD PLACE, 1040
CINCINNATI, OH.  45202  US

## Article VI

The effective date for this Limited Liability Company shall be:

08/16/2013

Signature of member or an authorized representative of a member

Electronic Signature: BENJAMIN R GETTLER

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# __EXHIBIT 6__

**Avvo** 
Have no legal fear

Sign in          Registe

| Research Legal Advice | Ask a Lawyer | Find a Lawyer | Review Your Lawyer |

Lawyer's name -OR- Practice area                    New York, NY

Home > All Lawyers > Florida > Miami > Lambros Paraskevas Katsoufis

# Lambros Paraskevas Katsoufis

- Is this you? Claim and update your profile for free.



**Avvo Rating**

What is the Avvo Rating?

**Client Reviews**
Not yet reviewed
Current or former
client? Write a review



No professional
misconduct found.



MOM.

MARATHON RUNNER.

| **Email Lawyer** | Save | Send to a friend |

---

## OVERVIEW

CONTACT
INFORMATION

**Kyma Ship Management Inc.**
3035 Orange St
Miami, FL 33133
Office: 786-303-6376
⚲ View map | Edit this address

✉ Email this lawyer

---

## REFERENCES

CLIENT REVIEWS

### How would you rate this lawyer?
If you're a current or former client, share your thoughts
(anonymously, if you prefer). Would you recommend this
lawyer to other clients?

Review this lawyer

PEER
ENDORSEMENTS

### Endorse a fellow lawyer, get more visits to your
profile
In addition to providing a simple way to express your
gratitude to fellow lawyers, any time you add an

Endorsements a peer's profile, a link to your profile will appear on it.

Endorse this lawyer

# RÉSUMÉ

## LICENSE

✔ We have not found any instances of professional misconduct for this lawyer.

13 years since Lambros Paraskevas Katsoufis was first licensed to practice law.

| State | License status | Year acquired | Last updated by Avvo |
|-------|----------------|---------------|----------------------|
| Florida | Member in Good Standing | 2000 | 08/30/2013 |

## EDUCATION

| School | Major | Degree | Graduated |
|--------|-------|--------|-----------|
| University of Miami School of Law | Doctor of Jurisprudence/Juris Doctor | | 1999 |

## Lambros Paraskevas Katsoufis - Is this your profile?

✔ Claiming your profile is free and easy.
✔ Highlight your practice areas, work experience, speaking engagements, awards, etc.
✔ Showcase your expertise and selected case histories.

Claim your profile for free


Avvo  Have no legal fear

| Explore Avvo | For Lawyers | Company Info |
|--------------|-------------|--------------|
| Ask a Lawyer | Marketing Solutions | About Us |
| Find a Lawyer | Claim Your Profile | Support |
| Free Legal Advice | For Law Firms | Press Room |
| Review a Lawyer | Avvo Ignite | Partner With Us |
| | Lawyernomics Blog | Jobs |
| | | Avvo Blog |

# **EXHIBIT 7**

**Annex A**

**M/V GENERAL PIAR**

**TONNAGE CONSIDERED AS PER FMO FIGURES**

| Voyage | Ref. | MT Loaded | MT Discharged | Discharged to M/V: | Start Unloading | End Unloading | Time Discharging (days) | Time Discharging (hrs) | Rate as per Vessel Spec. (MT/Hr) | Rate Performed (MT/Hr) | Time Expected (hrs) | Time Performed (hrs) | Time Differences (hrs) | Off Hire during shuttling services (hrs) | Off Hire during discharging operations (hrs) | Total Time Lost (days) | Rate (USD/days) | Off Hire Amount (USD) | Estimated MDO consumed per voyage (MT) | MDO Price Applicable per Voyage (USD/MT) | Bunker Cost (USD) | MT discharged with BG II Cranes (MT) | BG II Cranes Cost (USD) and surveys | Total Cost to be deducted per voyage (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | PRIOR 1ST DRY DOCK 2010 | 33,330.00 | 33,387.00 | BGII | | | | 41.12 | 3,000.00 | 812.01 | 11.13 | 41.12 | 29.99 | | | 1.25 | 25,641.03 | 32,037.92 | 7.50 | 712.47 | 5,341.30 | | | 37,379.22 |
| | | | | MV PANTAZISD | 3/14/10 12:35 | 3/14/10 13:50 | 0.05 | | | | | | | | | | | | | | | | | |
| 002 | | 26,940.00 | 28,235.00 | MV ZENG FENG | 3/16/10 12:55 | 3/17/10 10:40 | 0.91 | 23.00 | 3,000.00 | 1,227.61 | 9.41 | 23.00 | 13.59 | | | 0.57 | 25,641.03 | 14,517.45 | 3.40 | 712.47 | 2,420.32 | | | 16,937.77 |
| 003 | | 36,030.00 | 37,377.00 | BGII | | | | 21.87 | 3,000.00 | 1,709.31 | 12.46 | 21.87 | 9.41 | | | 0.39 | 25,641.03 | 10,050.98 | 2.35 | 742.00 | 1,745.13 | | | 11,796.11 |
| 004 | | 31,650.00 | 32,420.00 | BGII | | | | 17.32 | 3,000.00 | 1,872.18 | 10.81 | 17.32 | 6.51 | | | 0.27 | 25,641.03 | 6,955.18 | 1.63 | 774.00 | 1,259.69 | | | 8,214.87 |
| 005 | | 31,770.00 | 31,770.00 | BGII | | | | 51.28 | 3,000.00 | 619.50 | 10.59 | 51.28 | 40.69 | | 66.42 | 1.70 | 25,641.03 | 43,475.75 | 18.48 | 774.00 | 14,299.96 | | | 57,775.71 |
| | | | | MV IRIDA | 5/14/10 16:10 | 5/15/10 6:15 | 0.59 | | | | | | | | | | | | | | | | | |
| 006 | | 35,500.00 | 33,550.00 | MV HADJAR | 5/15/10 13:40 | 5/16/10 2:20 | 0.49 | 25.92 | 3,000.00 | 1,294.37 | 11.18 | 25.92 | 14.74 | | | 0.61 | 25,641.03 | 15,744.30 | 3.68 | 745.50 | 2,746.55 | | | 18,490.85 |
| 007 | | 32,650.00 | 34,600.00 | BGII | | | | 60.92 | 3,000.00 | 567.99 | 11.53 | 60.92 | 49.38 | | | 2.06 | 25,641.03 | 52,759.87 | 12.35 | 745.50 | 9,203.80 | | | 61,963.67 |
| 008 | | 35,000.00 | 35,000.00 | BGII | 6/15/10 23:40 | 6/16/10 21:40 | 0.92 | 22.00 | 3,000.00 | 1,590.91 | 11.67 | 22.00 | 10.33 | | | 0.43 | 25,641.03 | 11,039.89 | 2.58 | 745.50 | 1,925.88 | | | 12,965.76 |
| 009 | | 35,400.00 | 35,400.00 | BGII | | | | 44.50 | 3,000.00 | 795.51 | 11.80 | 44.50 | 32.70 | | | 1.36 | 25,641.03 | 34,935.90 | 8.18 | 745.50 | 6,094.46 | | | 41,030.37 |
| | | | | BGII | | | 27.42 | | | | | | | | | | | | | | | | | |
| 010 | | 36,600.00 | 34,443.00 | SUCCESS POWER | 7/27/10 12:50 | 7/28/10 11:30 | 0.94 | 28.36 | 3,000.00 | 1,214.30 | 11.48 | 28.36 | 16.88 | | | 0.70 | 25,641.03 | 18,037.87 | 4.22 | 745.50 | 3,146.65 | | | 21,184.52 |
| | | | | | 8/6/10 21:50 | 8/7/10 3:55 | 0.25 | | | | | | | | | | | | | | | | | |
| | | | | | 8/7/10 12:00 | 8/9/10 8:00 | 1.83 | | | | | | | | | | | | | | | | | |
| 011 | | 32,700.00 | 31,085.00 | PB PHOENIX | 8/10/10 14:30 | 8/11/10 10:00 | 0.81 | 69.58 | 3,000.00 | 446.73 | 10.36 | 69.58 | 59.22 | | 100.75 | 2.47 | 25,641.03 | 63,271.02 | 27.40 | 731.00 | 20,028.79 | | | 83,299.81 |
| 012 | | 35,980.00 | 38,677.00 | BGII | | | | 36.35 | 3,000.00 | 1,064.02 | 12.89 | 36.35 | 23.46 | | | 0.98 | 25,641.03 | 25,061.61 | 5.86 | 742.00 | 4,351.40 | | | 29,413.01 |
| 013 | | 31,700.00 | 36,099.00 | BGII | | | | 27.82 | 3,000.00 | 1,297.74 | 12.03 | 27.82 | 15.78 | | 3.00 | 0.66 | 25,641.03 | 16,863.06 | 4.32 | 738.50 | 3,191.03 | | | 20,054.08 |
| Voyages from 014 to 034 during 2011/2012 Time lost due to low performance Rate + OFF HIRES | | | | | | | | | | | | | | | | | | | | | | | | |
| 014 | PRIOR 2ND DRY DOCK HIRE 2011 | 32,860.00 | 33,667.00 | | | | | 16.82 | 3,000.00 | 2,002.00 | 11.22 | 16.82 | 5.59 | 167.76 | 10.30 | 7.65 | 26,153.85 | 200,136.18 | 23.66 | 1,014.50 | 23,999.10 | | | 224,135.28 |
| 015 | | 35,020.00 | 34,427.00 | | | | | 24.65 | 3,000.00 | 1,396.63 | 11.48 | 24.65 | 13.17 | | 0.97 | 0.59 | 26,153.85 | 15,413.70 | 3.41 | 1,014.50 | 3,464.35 | | | 18,878.05 |
| 016 | | 32,240.00 | 31,899.00 | | | | | 24.98 | 3,000.00 | 1,276.81 | 10.63 | 24.98 | 14.35 | | - | 0.60 | 26,153.85 | 15,638.21 | 3.59 | 1,047.50 | 3,758.00 | | | 19,396.21 |
| 017 | | 32,380.00 | 32,818.00 | | | | | 19.58 | 3,000.00 | 1,675.81 | 10.94 | 19.58 | 8.64 | | - | 0.36 | 26,153.85 | 9,419.78 | 2.16 | 1,047.50 | 2,263.66 | | | 11,683.44 |
| 018 | | 31,020.00 | 31,379.00 | | | | | 18.87 | 3,000.00 | 1,663.20 | 10.46 | 18.87 | 8.41 | | - | 0.35 | 26,153.85 | 9,161.45 | 2.10 | 1,062.00 | 2,232.05 | | | 11,393.50 |
| 019 | | 33,310.00 | 33,337.00 | | | | | 20.73 | 3,000.00 | 1,607.89 | 11.11 | 20.73 | 9.62 | | - | 0.40 | 26,153.85 | 10,484.48 | 2.41 | 1,092.00 | 2,626.55 | | | 13,111.03 |
| 020 | | 32,140.00 | 32,088.00 | | | | | 22.13 | 3,000.00 | 1,449.76 | 10.70 | 22.13 | 11.44 | | 7.33 | 0.78 | 26,153.85 | 20,451.57 | 3.78 | 1,059.50 | 4,000.23 | | | 24,451.79 |
| 021 | | 35,230.00 | 27,749.00 | | | | | 44.28 | 3,000.00 | 626.67 | 9.25 | 44.28 | 35.03 | 269.83 | 48.47 | 14.72 | 26,153.85 | 385,043.15 | 14.82 | 1,059.50 | 219,709.50 | 3,866.56 | 22,164.61 | 626,917.27 |
| 022 | | 34,150.00 | 40,017.00 | | | | | 42.77 | 3,000.00 | 935.71 | 13.34 | 42.77 | 29.43 | | 2.25 | 1.32 | 26,153.85 | 34,520.31 | 7.64 | 1,024.50 | 7,825.25 | | | 42,345.56 |
| 023 | | 38,760.00 | 38,919.00 | | | | | 31.40 | 3,000.00 | 1,239.46 | 12.97 | 31.40 | 18.43 | | 4.43 | 0.95 | 26,153.85 | 24,908.27 | 5.16 | 1,024.50 | 5,286.93 | | | 30,195.21 |
| 024 | | 40,130.00 | 40,784.00 | | | | | 34.90 | 3,000.00 | 1,168.60 | 13.59 | 34.90 | 21.31 | | 1.37 | 0.94 | 26,153.85 | 24,710.30 | 5.50 | 1,055.00 | 5,799.95 | | | 30,510.25 |
| 025 | | 39,850.00 | 41,629.00 | | | | | 29.10 | 3,000.00 | 1,430.55 | 13.88 | 29.10 | 15.22 | | 3.17 | 0.77 | 26,153.85 | 20,044.38 | 4.20 | 1,012.00 | 4,252.59 | | 688,691.07 | 712,988.05 |
| 026 | | 36,540.00 | 36,959.00 | | | | | 21.83 | 3,000.00 | 1,692.78 | 12.32 | 21.83 | 9.51 | | 0.42 | 0.41 | 26,153.85 | 10,825.13 | 2.43 | 1,031.50 | 2,507.49 | | | 13,332.62 |
| 027 | | 28,270.00 | 27,904.00 | | | | | 19.33 | 3,000.00 | 1,443.31 | 9.30 | 19.33 | 10.03 | 189.36 | (10.33) | 7.88 | 26,153.85 | 206,025.54 | 26.18 | 1,069.50 | 27,997.37 | | 4,131.60 | 238,154.52 |
| 028 | | 35,800.00 | 35,421.00 | | | | | 23.25 | 3,000.00 | 1,523.48 | 11.81 | 23.25 | 11.44 | | 3.42 | 0.62 | 26,153.85 | 16,196.86 | 3.29 | 1,069.50 | 3,516.78 | | | 19,713.64 |
| 029 | | 33,180.00 | 34,580.00 | | | | | 31.67 | 3,000.00 | 1,092.00 | 11.53 | 31.67 | 20.14 | | - | 0.84 | 26,153.85 | 21,947.44 | 5.04 | 1,092.00 | 5,498.22 | | | 27,445.66 |
| 030 | | 29,430.00 | 29,430.00 | | | | | 47.05 | 3,000.00 | 625.50 | 9.81 | 47.05 | 37.24 | (116.98) | 147.10 | 2.81 | 26,153.85 | 73,401.54 | 16.70 | 1,092.00 | 18,233.67 | 11,738.00 | 31,023.00 | 122,658.21 |
| 031 | HIRE 2012 | 25,556.00 | 24,200.00 | | | | | 29.77 | 3,000.00 | 812.99 | 8.07 | 29.77 | 21.70 | | 11.82 | 1.40 | 26,676.93 | 37,258.78 | 6.90 | 1,095.50 | 7,561.69 | | | 44,820.46 |
| 032 | | 27,160.00 | 28,888.00 | | | | | 25.08 | 3,000.00 | 1,151.63 | 9.63 | 25.08 | 15.46 | | 1.42 | 0.70 | 26,676.93 | 18,757.34 | 4.04 | 1,095.50 | 4,427.22 | | | 23,184.56 |
| 033 | | 31,320.00 | 31,320.00 | | | | | 29.42 | 3,000.00 | 1,064.70 | 10.44 | 29.42 | 18.98 | | - | 0.79 | 26,676.93 | 21,093.38 | 4.74 | 1,120.00 | 5,313.49 | | | 26,406.87 |
| 034 | | 42,140.00 | 42,690.00 | | | | | 64.25 | 3,000.00 | 664.44 | 14.23 | 64.25 | 50.02 | | 3.92 | 2.25 | 26,676.93 | 59,956.40 | 13.00 | 1,045.00 | 13,579.78 | | | 73,536.18 |
| | | | | | | | | DISCHARGING AVERAGE RATE | | | 1,207.53 | MT/Hr | | | | | Total Time Lost Cost (USD) | | 262.67 | Total Bunker Cost (USD) | | 15,604.56 | Various Cost (USD) | 2,775,764.12 |

Information OK Bunker Quotations
Information OK From FULL SAILING STATEMENT OF EACH VOY IN BGII
Information OK From Cargo Documents (Conocimiento de embarque)
Information OK SOF

| | | |
|---|---|---|
| **TOTAL AMOUNT TO BE DEDUCTED TO GP** | **2,791,631.35** | **USD** |