Michael J. Frevola
Christopher R. Nolan
F. Robert Denig
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd St.
New York, NY  10019
Telephone:  (212) 513-3200
Telefax:  (212) 385-9010
michael.frevola@hklaw.com
christopher.nolan@hklaw.com
robert.denig@hklaw.com
marie.larsen@hklaw.com

ATTORNEYS FOR PLAINTIFF
COMMODITIES & MINERALS ENTERPRISE LTD.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITIES & MINERALS ENTERPRISE LTD.,<br><br>Plaintiff,<br><br>-against-<br><br>GRETCHEN SHIPPING INC., KYMA SHIP MANAGEMENT INC., PARIS KATSOUFIS, LAMBROS KATSOUFIS, V&H VENTURES, LTD., GERARDO A. VAZQUEZ, P.A. d/b/a VAZQUEZ & ASSOCIATES, GERARDO A. VAZQUEZ, VIPSEN CORP., and STEPHEN HARRINGTON,<br><br>Defendants. | Civil Action No. 13 CV 6548 (PKC)<br><br>**AMENDED COMPLAINT** |

Plaintiff, Commodities & Minerals Enterprise Ltd. ("CME"), respectfully files this

Complaint against Defendants Gretchen Shipping Inc. ("Gretchen"), Kyma Ship Management

Inc. ("Kyma"), Paris Katsoufis, Lambros Katsoufis, V&H Ventures, Ltd. ("V&H"), Gerardo A. Vazquez, P.A. d/b/a Vazquez & Associates (the "Firm"), Gerardo A. Vazquez ("Vazquez"), Vipsen Corp. ("Vipsen"), and Stephen Harrington ("Harrington") (collectively, "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action arising out of the chartering of the *M/V GENERAL PIAR* ("the Vessel"), in which the Vessel's owner (Gretchen) and its manager (Kyma) conspired with the other Defendants, including CME's previous counsel, to induce CME to charter the Vessel at an above-market rate and under grossly one-sided terms, by which charter all Defendants profited by defrauding plaintiff CME.

2.      The Vessel was chartered by CME as a result of meetings in Florida amongst CME and Defendants Kyma through Defendants Paris Katsoufis and Lambros Katsoufis (on Kyma's own behalf and as the representative of Gretchen), Harrington (principal of Defendant Vipsen), and Vazquez (principal of Defendant Firm).  As described further below, Defendant Vazquez was CME's lawyer and acted as CME's representative during the charter fixture discussions.  Unknown to CME until recently, however, Vazquez had been incentivized by some or all of the other Defendants to induce CME to enter the Vessel charter through a promised kickback on each hire payment made by CME, the total of which kickbacks to the Firm/Vazquez now exceed $500,000.

3.      Plaintiff CME seeks rescission of the Vessel's charter or damages resulting from the Defendants' fraudulent inducement of CME to enter the Vessel's charter at the agreed terms, including overpayment of the hire price and payment of fraudulently-obtained kickbacks, termination of the Vessel's charter under the doctrine of frustration, damages for breaches of

fiduciary duty, legal malpractice, and tortious interference with contract, treble damages under the Racketeer Influenced and Corrupt Organizations Act, and/or punitive damages, attorneys' fees and costs under Florida's Deceptive and Unfair Trade Practices Act.

## JURISDICTION AND VENUE

4.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the fraudulent inducement of a maritime contract, i.e., an executed time charter party for the employment of a seagoing cargo. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

5.      This case also falls under this Court's federal question jurisdiction under 28 U.S.C. § 1331.

6.      This Court also has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367 as the fraudulent and/or negligent acts alleged herein arise from a common nucleus of operative facts.

7.      This Court has *in personam* jurisdiction over Defendant Gretchen as Gretchen has contractually agreed to be subject to this Court's jurisdiction under the forum selection clause contained in the Vessel's Charter.

8.      This Court has *in personam* jurisdiction over the remaining Defendants as they each are bound to the forum selection clause contained in the Vessel's Charter through principles of agency, veil-piercing/alter ego, and/or estoppel.  Each of the Defendants was involved in the negotiation of the Vessel's Charter which contained the New York forum selection clause.  Each of the Defendants has directly benefited from the Vessel Charter.

9.     Venue for Plaintiff's admiralty and maritime claims is proper pursuant to Fed. R. Civ. P. 82, and for claims over which supplemental jurisdiction is alleged, pursuant to 28 U.S.C. section 1391(b)(3), because all Defendants are bound to the forum selection clause contained in the Vessel's Charter.

## FACTUAL BACKGROUND

**The Parties and the Charter**

10.     Plaintiff CME is a company which specializes in the trading of commodities and minerals (primarily iron ore).  CME was and is a company organized and existing under the laws of the British Virgin Islands.  To the extent that CME has a principal place of business, CME's personnel generally operate from an office in Puerto Ordaz, Venezuela.

11.     Defendant Gretchen is a company organized and existing under the laws of the Republic of Liberia.  Gretchen is the registered owner of the Vessel.  Gretchen has a business address "c/o Kyma Ship Management Inc."  On January 25, 2010, CME time chartered the Vessel from Gretchen for a period of 60 months on the BALTIME 1939 Form, as amended by the parties (the "Charter").  A true copy of the Charter is annexed as Exhibit 1.

12.     Defendant Kyma is a ship management company organized and existing under the laws of the Republic of Panama with a registered office care of a Panamanian law firm, Arias, Fabrega & Fabrega, Plaza 2000, 16th Floor, 50th Street, P.O. Box 0816-01098, Panama, Republic of Panama.  Defendant Kyma has a current business address at 1801 SW 3rd Avenue, Suite 200, Miami, FL 33129.  As Kyma apparently has no website and it has a Facebook page containing no information, little public information exists as to the extent of Kyma's operations besides managing Defendant Gretchen.

13.     Defendant Gretchen is an alter ego of Kyma, in that Gretchen has no known employees of its own, all of its affairs are managed by Kyma, and all of its income is managed by Kyma.  Gretchen further uses Kyma's address and contact details as its own.  Gretchen was established as a result of the Charter, in that the Vessel was purchased by Kyma's personnel to perform the Charter and Gretchen was created to "own" the Vessel as a single ship entity. Gretchen was not created until approximately three weeks after the Charter was signed by Kyma on Gretchen's purported behalf.  With respect to the Charter, Kyma's secretary and director Lambros Katsoufis executed the Charter on behalf of Gretchen Shipping as Gretchen's secretary as well.  Upon information and belief, all of Gretchen's officers and/or directors are officers and/or directors of Kyma as well, such that Kyma dominates and controls Gretchen to the point where Gretchen has no independence of thought or action.  Lambros Katsoufis also executed Addenda #1 and #2 to the Charter dated January 29, 2010 and February 9, 2011 "[f]or and on behalf of Gretchen Shipping."  True copies of Addenda #1 and #2 are annexed as Exhibit 2.  A true copy of the Florida Department of State, Division of Corporations registration listing for Kyma as a foreign business registered to do business in Florida and showing Lambros Katsoufis' secretary and director positions with Kyma is annexed as Exhibit 3.

14.     Defendant Firm is a law firm organized and existing under the laws of the State of Florida with an address of Courvoisier Center II, 601 Brickell Key Drive, Suite 702, Miami, FL 33131.

15.     Defendant Vipsen is a business organized and existing under the laws of the State of Florida with an address of 4550 Bay Point Road, Miami, FL 33137.

16.     Defendant Paris Katsoufis is a resident of the State of Florida.

17.     Defendant Lambros Katsoufis is a resident of the State of Florida and is an attorney licensed to practice law in the State of Florida.

18.     Defendant Vazquez is a resident of the State of Florida and is an attorney licensed to practice law in the State of Florida.

19.     Defendant Harrington is a resident of the State of Florida.

20.     The Vessel is a bulk carrier, class Lloyd's Register, of approximately 62,594 dwt.

**CME's Venezuelan Iron Ore Project**

21.     CME trades commodities and minerals, particularly iron ore, which is purchased from the mining company, CVG Ferrominera Orinoco CA ("FMO") in Venezuela.  CME largely sells to customers in China, but it also has provided shipments to the European and American markets.

22.     When CME began trading in 2004, its transactions with Venezuelan suppliers were simply buy/sell transactions.  Over time, however, the economic situation in Venezuela deteriorated.  CME's customer FMO suffered severe cash flow problems, affecting its operations, including but not limited to its production capacity.

23.     As a result of the Venezuelan economic deterioration, CME worked with FMO and adapted its business operation so that it would supply FMO with equipment and spares required by FMO under a barter arrangement (i.e., CME would provide equipment and spares to FMO in exchange for iron ore and derivative iron products).  Under this arrangement, CME was involved with a number of projects, including supplying of a ship loader, a wagon tilter and a stacker.  CME has supplied over 1000 wagons to FMO, which are used for transporting material by rail from the mine to the production plant.

24.     CME also had a contract with FMO for the operation, maintenance and management of the "Transfer System." The "Transfer System" is the name given to a particular operation for loading vessels in Puerto Ordaz. FMO owns a transfer station, which is a large vessel, the *M/V BOCA GRANDE II*, which is anchored offshore Venezuela in deep water. When vessels arrive in Venezuelan waters to load iron ore at FMO's facility, the vessels enter the Orinoco River from the Atlantic Ocean and navigate approximately 178 miles upriver to FMO's port facility. Because of draft restrictions, vessels do not load to capacity but rather load only to a tonnage permitted by the river depth. The partially-laden vessels then return downriver. Once the vessels exit the river into open waters, they sail approximately 100 miles to the Transfer Station (the *M/V BOCA GRANDE II*), where the vessel will complete loading to the agreed tonnage.

25.     A number of shuttle vessels operate between FMO's port facility and the Transfer Station for purposes of keeping the Transfer Station loaded with iron ore to top off the outbound partially-laden vessels. The Vessel was one of those shuttle vessels.

**CME's Charter of the Vessel**

26.     In mid-2009, CME was advised by FMO that one of its shuttle vessels, the *M/V RIO ORINOCO*, was being taken out of service due to its age and condition. In addition, FMO's other shuttle, the *M/V RIO CARONI*, was scheduled to undergo drydocking. CME realized that it would have to replace this loss of capacity in the vessel shuttle service caused by the retirement of the *M/V RIO ORINOCO*.

27.     At this time, CME was being represented by the Defendant Firm (through Defendant Vazquez) in a dispute with non-party Agrico Sales Inc. ("Agrico") concerning cost overruns in a shiploader construction contract that Agrico had agreed to perform. The dispute

with Agrico proceeded to arbitration in Miami, with the Firm (through Defendant Vazquez) representing CME, and continued until an award was issued on October 30, 2012. Vazquez and the Firm previously had represented CME in performing some of CME's corporate filings, in which capacity the Defendant Firm (through Vazquez) continued to represent CME until several weeks ago.

28.     In connection with his ongoing representation of CME discussed in the preceding paragraph, the Firm and Vazquez learned from CME that it was looking to charter a vessel to replace the loss of capacity that would occur as a result of the retirement of the *M/V RIO ORINOCO*.

29.     After Vazquez and the Firm learned from CME that it was looking for a replacement vessel, Vazquez called CME's president Mr. Tyrone Serrao and told Mr. Serrao that he had a Greek friend in the shipping business (Defendant Kyma's president, Defendant Paris Katsoufis) who might be able to provide a vessel for the shuttle service. Vazquez relayed to Mr. Serrao an invitation from Paris Katsoufis for Mr. Serrao to have dinner at Paris Katsoufis' house. Subsequent to this dinner, in November 2009, Defendant Paris Katsoufis, Defendant Harrington, and Defendant Vazquez visited CME's operations in Venezuela with CME's Mr. Serrao to educate themselves on CME's operations.

30.     In November and December 2009, Defendant Paris Katsoufis in his capacity as Defendant Kyma's president corresponded with CME repeatedly by e-mail (usually with CME's Arturo Contreras and/or CME's attorney Defendant Vazquez) regarding the Vessel. On or about December 4, 2009, Defendant Kyma sent to CME a "Letter of Intent" regarding CME's chartering of the Vessel, which Letter of Intent listed Kyma as the would-be charterer of the Vessel (or its nominee). A true copy of the Letter of Intent is annexed as Exhibit 4. The Letter

of Intent was a result of the negotiations performed by CME's Arturo Contreras together with Defendant Vazquez. CME's president Tyrone Serrao was uncomfortable with the terms of the Letter of Intent, including the provision of a Standby Irrevocable Letter of Credit to Kyma without a reciprocal guarantee from Kyma. Mr. Serrao questioned Defendant Vazquez as to the need for the Letter of Credit and why CME should not have one in return. Defendant Vazquez told Mr. Serrao that Kyma was at the stage of purchasing a vessel solely for the purpose of the Charter and needed some form of guarantee from CME, but that it was unnecessary for Kyma to provide such a guarantee as CME would be able to seize the Vessel should Kyma default. Mr. Serrao questioned the feasibility of this with Vazquez on the basis that Kyma might be have mortgaged the Vessel leaving little equity, but Defendant Vazquez reassured Mr. Serrao that there would not be any problem and that he could sign the Letter of Intent. On the basis that Defendant Vazquez was acting as CME's lawyer, Mr. Serrao accepted his advice and signed the Letter of Intent. At that point, from what Defendant Paris Katsoufis told CME, the Vessel was not yet owned by Gretchen and was not yet managed by Kyma.

31.     On December 9, 2009, Mr. Katsoufis and CME's Arturo Contreras visited the Vessel in Jacksonville, Florida to inspect it. True copies of Mr. Katsoufis' e-mails dated December 11, 2009 and December 21, 2009 regarding the Vessel (then named the *M/V CHRISTOFFER OLDENDORFF*) and containing representations regarding the Vessel's capabilities are annexed as Exhibit 5.

32.     On Tuesday, January 19, 2010, CME's Carlos Suarez sent to Kyma's Paris Katsoufis a proposed time charter party for purposes of discussion during upcoming negotiations regarding the Charter. That proposed time charter was a "back-to-back" version of the time charter that CME would have with FMO for the Vessel's use as a shuttle vessel.

33.     On Wednesday, January 20, 2010, CME's Arturo Contreras and Defendant Vazquez met with Kyma/Gretchen at Kyma's Miami office to discuss the terms of the Charter.

34.     During this first day of negotiations or shortly thereafter, Kyma/Gretchen rejected CME's proposed time charter in its entirety.  They explained to CME that the form proposed by CME was unacceptable, and countered with the BALTIME 1939 form that they provided to CME prior to the parties' next meeting.  According to Kyma/Gretchen, the BALTIME 1939 form was the form that had to be used.  The form that Kyma/Gretchen provided, with Parts I and II already filled out, was the Charter (a true copy of which is annexed as Exhibit 1).

35.     Between Friday, January 22, 2010 and Monday, January 25, 2010, the parties met further to negotiate the Charter.  These meetings largely were held at Kyma's Miami office, although at least one meeting took place at the Miami office of CME's affiliated company, Lubercy Investments, Inc.  In attendance for CME for these meetings were its personnel Tyrone Serrao, Lisa Sherriff, and Carlos Suarez, as well as its attorney Defendant Vazquez.  CME's Arturo Contreras also attended a portion of the negotiations.  In attendance on Gretchen's behalf were Defendant Paris Katsoufis, Defendant Lambros Katsoufis, Mr. Mark Davis, and Defendant Harrington.  It was CME's understanding that Harrington was a consultant for the Vessel's ownership interests.

36.     Before CME agreed to the Charter, CME was reluctant to sign the Charter because certain terms gave CME concern, including the same concerns addressed in connection with the Letter of Intent, plus Gretchen/Kyma wanted CME to cover a portion of the Vessel's War Risk Insurance for the Vessel and Gretchen/Kyma did not include a *force majeure* clause in the Charter.  At one point, during a meeting at Kyma's offices in the late afternoon/early evening of Sunday, January, 24, 2010, CME's personnel walked out of the negotiations.  Each time that

CME was on the verge of ending the negotiations, however, they were assured by Vazquez and the Firm that the Charter's terms − and specifically the Letter of Credit clause and lack of *force majeure* clause − were acceptable and commonplace and that CME should agree to the Charter. As Vazquez was CME's attorney and the Firm was representing CME in a number a capacities, CME believed Vazquez when he gave CME his advice that the Charter's terms were ordinary and acceptable.

37.    Eventually, on Monday, January 25, 2010, CME agreed to execute the Charter. The initial daily hire rate for the Vessel was $25,641.03, which rate would increase 2% per annum.  As part of the commencement of the Charter, CME opened a $2.5 million standby irrevocable Letter of Credit with HSBC.  Subsequently, the HSBC Letter of Credit was closed and replaced by a $2.5 million standby irrevocable Letter of Credit opened with Citibank (the "Citibank Letter of Credit").

38.    At no time before the Charter's execution did Firm and Vazquez disclose to CME that they had a financial interest in the execution of the Charter.  Similarly, at no time before the Charter's execution did any of the other Defendants disclose to CME that Defendants Firm and Vazquez had a financial interest in the execution of the Charter.

39.    Had CME known that Defendants Firm and Vazquez had a financial interest in the execution of the Charter, CME would have consulted with another lawyer to obtain independent advice regarding the Charter prior to executing it.

40.    Defendant Firm invoiced CME by retainer during the time that the Charter negotiations were taking place, which invoices CME paid and which invoices CME understood covered Vazquez's time incurred while participating in the Charter negotiations.

**Recent Developments in Venezuela**

41.    In the last two years, the situation with FMO, and with Venezuela in general, has grown increasingly worse.  Despite CME's efforts to work with FMO, FMO's cash flow has continued to be a problem and, in turn, that has impacted production.  As a consequence, FMO provided CME with much less iron ore than the contractually-agreed quantity.  Nevertheless, CME continued to honor its agreements with FMO regarding the Transfer System and with Gretchen regarding the Vessel.

42.    As another way to prevent FMO's cash flow shortages from interfering with production, in 2012 CME executed an "Ex Works" contract with FMO.  As part of that contract, CME paid FMO's mining subcontractors for various work performed (such as loading material from the mine, transporting it to the crushing plant for crushing, screening and separating, and transporting the finished product to FMO's port facility).  In return for its paying FMO's subcontractors, CME was to be reimbursed with iron ore under its Strategic Alliance Agreement with FMO.

43.    Despite CME's assistance to FMO, FMO did not perform its obligations in return.  Frequently, the material produced, which production CME helped facilitate and which should have been provided to CME, instead was supplied to others.  Not only did FMO prefer other customers over CME, but the circumstances of some of these other transactions has led CME to question the legitimacy of those transactions.  As a result, CME's operations were disrupted and it has caused CME problems with its customers.

44.    The most recent changes in Venezuela finally made CME's situation untenable.  Within the past three to four months, major changes have taken place within FMO.  The Venezuelan military has taken over management of all government-owned companies.  One of

the byproducts of the change in management is that the military opened investigations into certain of FMO's contracts and discovered a number of them to be irregular.

45.     As a result of its investigations, the Venezuelan military took the view that all of FMO's contracts were irregular.  Within the last several weeks, all supply contracts have been placed on hold.  CME was advised that all of FMO's supply contracts were being cancelled, and CME's shipping agent in Venezuela reported to CME that the Vessel was being released from shuttle service.  The Vessel now has been released from shuttle service and has been redelivered to Gretchen.

**CME's Discovery of Vazquez's Duplicity**

46.     When the Venezuelan military took over management of FMO, CME contacted maritime counsel for guidance on what options CME might have with respect to the Charter in light of FMO's non-performance under its obligations to CME.

47.     As a result of that consultation, CME learned that charter parties typically contain a "force majeure" clause that protects both parties against unexpected occurrences such as the events in Venezuela, especially charter parties of a vessel for an extended period of time such as the Charter and especially when the charter contemplates servicing a region in which political upheaval is a threat.  The Charter, however, did not contain such a clause because Vazquez advised CME that it was not needed.

48.     CME also learned that two clauses contained in the Charter were highly unusual: (a) Clause 20, which contained the provision that "[h]ire to be paid punctually and regularly, strictly on time and without any delay . . . .", and (b) Clause 25, which required CME to establish a $2.5 million irrevocable standby letter of credit as security for its hire payments that could be

drawn upon by Gretchen immediately in the event that CME missed (or was late on) a hire payment.

49.     Other representations made by Gretchen/Kyma regarding the Charter that also turned out to be materially false were the impact of the War Risk Insurance and the Vessel's discharging rate.  With respect to the War Risk Insurance, Gretchen/Kyma advised during the Charter negotiations that the insurance premium for War Risk Insurance for the Venezuela region would be greater than normal because of the uncertain political situation.  As to the cost of that insurance, Gretchen advised that the annual increase in the insurance premium compared to regular risk areas would be less than $5,000.  In fact, the increase in insurance was ten times that amount (although later settled downwards).  With respect to the Vessel's discharging rate, Gretchen/Kyma represented that the Vessel would have a discharge rate of 4,500 metric tons/hour.  This was the primary reason why CME was motivated to charter the Vessel, because it needed a discharging rate of at least 3,000 metric tons/hour.  In actual operations, however, the Vessel discharged at rates as slow as 1,116 metric tons/hour and never more than 2,000 metric tons/hour.

50.     Furthermore, in comparing the Charter's daily hire rate against daily hire rates for other vessels on multi-year time charters fixed during the same period, the Charter's hire rate is approximately $10,000 more per day than the average daily hire rate obtained during the time period by other shipowners.  From the commencement of the Charter, CME has paid approximately $13,350,000 in charter hire more than the average daily rate of hire.

51.     As a result of the one-sided nature of the Charter, CME began to examine its files with respect to the negotiation and the execution of the Charter.  In particular, CME examined

Vazquez's behavior in insisting that CME execute the Charter as it was proposed by Gretchen/Kyma.

52.     On or about September 12, 2013, in discussing Vazquez's actions internally, CME's president Tyrone Serrao learned from vessel operations manager Carlos Suarez that Mr. Suarez had seen a few pages of documents that contained Vazquez's name on them. Mr. Suarez has been CME's representative managing an arbitration between CME and Gretchen under the Charter concerning the Vessel's inadequate discharge rate. The documents – which are Western Union payment order summaries of payments ordered by Kyma – had been produced by Gretchen's counsel to CME's counsel in late January 2013. True copies of those pages are annexed as Exhibit 6.

53.     The Western Union payment summaries annexed as Exhibit 6 show that Mr. Vazquez's Firm has been receiving payments from Kyma. Furthermore, the payments received by the Defendant Firm are identical in amount to payments received by another entity, Defendant Vipsen.

54.     Vipsen is a company owned by Defendant Harrington. In other words, both the Firm and Vipsen, whose principals Vazquez and Harrington participated in the Charter negotiations as CME's and the shipowner's respective consultants, are being paid identical amounts by Kyma.

55.     Clause 24 of the Charter, entitled "Brokerage commission and to whom payable" (Exhibit 1, Clause 24) shows that an entity called "V&H Ventures, Ltd." is allocated a 2.5% brokerage commission on the CME's hire payments made every 15 days. CME has never been advised what is V&H and whether it is in any way connected to its former attorney, Vazquez, and Kyma's/Gretchen's charter consultant, Harrington. This past week, however, in response to

an arbitration demand made to V&H, both Vazquez and Harrington responded and purported to nominate an arbitrator on V&H's behalf.

56.     Clause 1 of the Charter (entitled "Shipbroker"), however, has no indication that a broker (or brokers) was involved in the chartering of the Vessel.

57.     In reviewing Western Union payment summary dated September 7, 2012 in Exhibit 6, the collective sum paid to Vazquez ($4,994.42) and to Vipsen ($4,994.42), or $9,988.84, amounts to 2.5% of $399,553.60.

58.     In reviewing the Charter, Clause 19 of Exhibit 1, the daily hire payment for the first year of the Charter was $25,641.03.  Under that clause, the daily rate of hire was to increase by 2% each year.

59.     Under the Charter, in 2011 the daily hire rate rose to $26,153.85:

$25,641.03 (initial rate) x .02 (annual increase) = $512.82 + $25,641.03 = $26,153.85

60.     Under the Charter, in 2012 the daily hire rate rose to $26,676.93:

$26,153.85 (2011 rate) x .02 (annual increase) = $523.08 + $26,153.85 = $26,676.93

61.     Hire is payable under the Charter every 15 days as set forth in Part II, Clause 6 of Exhibit 1.  The hire payment due in September 2012, therefore, was $400,153.95:

$26,676.93 x 15 = $400,153.95

62.     The 2.5% commission due to V&H under the Charter in September 2012, therefore, would have been the amount of $10,003.84:

$400,153.95 \times .025 = \$10,0003.84$

63.     In comparing the amount actually received collectively by Vazquez and Vipsen in September 2012 from Kyma ($9,988.84) to the 2.5% commission that V&H was supposed to receive ($10,003.84), it can be seen that there is exactly a $15.00 difference between these amounts.

64.     There is no active or inactive company named "V&H Ventures, Ltd." in the Florida Department of State, Division of Corporations website.  True copies of a search of each of the sections of that website (corporations, partnerships, and fictitious names) performed on Friday, November 1, 2013 are annexed as Exhibit 7.  One company named "V&H Ventures LLC" was found in the website, but that company has a principal address in Cincinnati, Ohio and an effective date of origin listed as August 16, 2013 (or over 3 ½ years after the execution of the Charter).  A true copy of the Florida Department of State, Division of Corporations listing for "V&H Ventures LLC" is annexed as Exhibit 8.

65.     "V&H Ventures, Ltd." contains the first initials of the last names of Defendants Vazquez and Harrington.

66.     Based on the foregoing information, the following reasonably can be concluded:

a.     The payments being made to the Firm and Vipsen are in fact the commission mentioned in Clause 24 of the Charter (minus a $15.00 service charge associated with transferring the funds);

b.     The parties used the name "V&H Ventures, Ltd." to conceal payments destined to Vazquez and Vipsen.  Not only has CME failed to find a Florida business entity with such a name, but also it appears that Kyma/Gretchen are not paying "V&H Ventures, Ltd." the commission but rather are paying that commission to the Firm

and Vipsen, neither of which is listed as an appropriate recipient of the purported "commission."

c.  The name "V&H Ventures, Ltd." was used by Defendants in order to fraudulently conceal from CME that CME's own lawyer had a significant financial interest (to date approximately $500,000) in the Charter being consummated and had been co-opted by the other Defendants to convince CME to enter the egregiously one-sided Charter.

d.  Defendants' conspiracy was organized prior to the commencement of the Charter negotiations.  Kyma/Gretchen (through their president Paris Katsoufis and their secretary/lawyer Lambros Katsoufis) presented the already-prepared Charter − including the brokerage commission reference to "V&H Ventures, Ltd." − to CME on the first day of Charter negotiations.  Kyma/Gretchen would not have known where to direct payment unless it had orchestrated the conspiracy (including the use of "V&H Ventures, Ltd.") in advance.  Furthermore, despite the Charter explicitly providing the name "V&H Ventures, Ltd." as the payee of the commission, Defendants Kyma/Gretchen have paid Defendants Firm and Vipsen since rather than the stated payee under the Charter.

e.  Defendants also fostered the deception of CME by leaving Clause 1 of the Charter − the large box entitled "Shipbroker" − empty on the Charter while nevertheless including a brokerage commission at the bottom of that page.  If Clause 1 had been filled in − which should have been the case if there truly were brokers involved − it would have called to CME's attention the fact that a purported "broker" or "brokers" were involved in the transaction.

**Related Proceedings**

67.     On Monday, September 30, 2013, CME filed a maritime attachment proceeding in the United States District Court for the Middle District of Florida against Defendant Gretchen under Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule B") in a proceeding captioned *Commodities & Minerals Enterprise Ltd. v. Gretchen Shipping, Inc.*, No. 8:13-cv-2512-JSM-MAP.  In that proceeding, CME moved for, and obtained, a maritime attachment order that seeks to freeze the Citibank Letter of Credit funds. CME commenced the Tampa Rule B proceeding after this Court held in this proceeding on September 27, 2013 that the Citibank Letter of Credit proceeds, if any were created, would not be located in New York but rather would be located in Florida.

68.     On Friday, October 4, 2013, Gretchen filed a motion to vacate CME's Rule B Attachment Order issued by the Middle District of Florida.  That motion was heard on Friday, October 18, 2013, in Tampa, Florida.  At the request of the parties, the Tampa court has withheld rendering a decision on Gretchen's motion to vacate pending word from the parties regarding a potential resolution of the Letter of Credit dispute.

69.     On October 4, 2013, CME gave notice to each of the Defendants that CME was demanding arbitration under the Charter's arbitration clause.  In that notice, CME advised Defendants of the nature of its claims and nominated Anthony J. Siciliano as CME's arbitrator for those claims.  Under the rules of the Society of Maritime Arbitrators, Inc., which were incorporated into the Charter's arbitration clause, Defendants had 20 days to appoint an arbitrator.  A true copy of the cover e-mail as well as one of the arbitration demand letters as a representative example is annexed as Exhibit 9.

70.     On October 24, 2013, CME received three separate responses from various Defendants to CME's arbitration demand.  Defendants Gretchen, Kyma, Paris Katsoufis and Lambros Katsoufis responded together, with Paris Katsoufis and Lambros Katsoufis objecting to the arbitrability of the claims against them but indicating a willingness to arbitrate should certain conditions be satisfied.  In their response, they nominated Manfred W. Arnold as their proposed arbitrator.  A true copy of this response is annexed as Exhibit 10.  Defendants V&H, Vipsen and Harrington responded and objected to the arbitrability of CME's claims against them, but likewise named Mr. Arnold as their proposed arbitrator.  A true copy of this response is annexed as Exhibit 11.  Defendants V&H (again), the Firm, and Vazquez responded and objected to the arbitrability of CME's claims against them.  They, however, named James Warfield as their proposed arbitrator.  A true copy of this response is annexed as Exhibit 12.

71.     On October 28, 2013, CME's counsel wrote to Defendants acknowledging their responses and pointing out that Defendants had nominated two arbitrators despite the Charter's arbitration clause only allowing for Defendants to appoint one arbitrator.  A true copy of that letter is annexed as Exhibit 13.

72.     On October 30, 2013, V&H/Vipsen/Harrington and V&H/Firm/Vazquez responded separately but similarly, each stating that they were not bound by the arbitration agreements and would not discuss procedural issues regarding the demanded arbitration.  True copies of e-mails from both V&H/Vipsen/Harrington and V&H/Firm/Vazquez are annexed as Exhibit 14.

## COUNT I

### (Fraud in the Inducement – Recission – Against Defendants Gretchen and Kyma)

73.     Plaintiff CME repeats and realleges each and every allegation set forth in paragraphs 1-72 hereof with the same force and effect as if fully set forth herein.

74.     Defendants Gretchen and Kyma convinced Vazquez to act on their behalf during the Charter negotiations, in exchange for which agreement Vazquez would share a brokerage commission with Defendant Harrington.  To keep secret the existence of Vazquez's financial interest, Kyma/Gretchen typed into the Charter that the recipient of such commission was "V&H Ventures, Ltd."  Even though Kyma/Gretchen typed "V&H Ventures, Ltd." into the Charter as a commission recipient, Kyma/Gretchen knew that "V&H Ventures, Ltd." would not be receiving the actual commission for the Charter because Kyma/Gretchen's periodic payments are not made to "V&H Ventures, Ltd.," but rather to Vipsen and the Firm.  The signatory of the Charter for Gretchen, Lambros Katsoufis, is a Florida-licensed attorney.

75.     After this conspiracy had been arranged, Defendants Gretchen/Kyma all individually and jointly made one or more misrepresentations of material fact or omission to CME.  Specifically, Defendants Gretchen/Kyma represented to CME through their agent Vazquez that several of the aspects of the Charter, including the absence of a *force majeure* clause, the presence of the letter of credit security clause, and the inflated daily hire rate, were standard and unobjectionable clauses when in fact they were not.  Furthermore, Defendants Gretchen/Kyma represented to CME directly that the increased War Risk Insurance cost for the Vessel would be less than $5,000 annually (in reality the cost was approximately ten times that amount) and that the Vessel's cargo discharge rate would be 4,500 metric tons per hour (in reality the Vessel never has exceeded 2,000 metric tons per day).

76.     Defendants Gretchen/Kyma knew or should have known those representations were false.  With respect to the *force majeure* clause, the Katsoufis family has been in the shipping business for a lengthy period of time.  Paris Katsoufis completely was aware of the fact that Venezuela was an unstable area, as indicated by his comments in his December 11, 2009 e-mail (see Exhibit 5): "***of concern is the state of affairs in Venezuela and the unilateral decisions of its government***."  Harrington and Vazquez purported to be qualified professionals in the field.  Yet Defendants Kyma/Gretchen used Vazquez to convince CME that a *force majeure* clause was not necessary in a five year contract for the use of the Vessel in support of a Venezuelan-based business operation.  With respect to the charter market, Defendants knew that the proposed daily hire rate significantly exceeded the then-current market rates, but the remainder of the Defendants let Vazquez convince CME of the commercial reasonableness of the Charter.  Similarly, the Letter of Credit security clause is unique, yet Vazquez advised his clients that the clause was a common one.  As for the Vessel's discharge rate and War Risks Insurance, the numbers represented by Kyma/Gretchen clearly could have been ascertained by Kyma/Gretchen, but instead they represented numbers to CME that were grossly overestimated and underestimated, respectively.  With respect to the discharging rate, CME's interest in the Vessel was that it (purportedly) could discharge over 3,000 metric tons/hour.  As shown by the attached spreadsheet regarding Vessel discharge rates, a true copy of which is annexed as Exhibit 15, that representation was demonstrably false.

77.     Defendants Gretchen/Kyma intended that CME would be induced to act in reliance on one or more of the misrepresentations.  They wanted CME to be induced to act because of the money that could be made by them from the scheme.  Gretchen and Kyma stood to make collectively approximately $10,000/day more than prevailing market rates, which has

translated into over $13 million extra over the last 3 years, 8 months.  Harrington/Vipsen and Vazquez/Firm collectively have made approximately $1 million as a result of the scheme.

78.    CME did in fact act in justifiable reliance on one or more of the misrepresentations made by Defendants and suffered injury and damage as a result.  CME was entitled to rely upon its own attorneys (Vazquez and the Firm) to zealously represent CME's interests in the Charter negotiation.  Vazquez and the Firm were ethically obligated to act solely in CME's interest.  Vazquez and the Firm were ethically obligated to tell CME if they stood to gain financially from CME's entering into the Charter.  Not only did Vazquez and the Firm not reveal this financial conflict, but also Defendants all conspired to obscure the identity of the parties receiving the commission by using the reference "V&H Ventures, Ltd."  In doing this, Defendants Gretchen/Kyma deliberately hid the fact that Vazquez and the Firm stood to gain financially from the Charter's execution.  Furthermore, Kyma's/Gretchen's Lambros Katsoufis, the person signing for Gretchen, is a Florida-licensed lawyer who should have been well-aware of the conflict of interest raised by the situation.

79.    CME also had a right to expect that its attorney would have the proper expertise to advise CME on those matters on which he accepted retention.  Therefore, when CME heeded Vazquez and the Firm's advice to enter into the Charter with the objectionable terms mentioned above, CME did so based upon the justifiable belief that its attorney would provide informed and conflict-free advice that would be in CME's best interests.  Instead, Vazquez and the Firm acted as an advocate for Kyma and Gretchen in urging CME to execute the Charter.  Had CME been aware of Vazquez's and the Firm's financial interest in the Charter, CME would have hired other counsel to advise it on the Charter negotiations.

80.    CME has tendered the Vessel back to Gretchen/Kyma.

81.     Defendants' Gretchen/Kyma actions described above entitle CME to rescind the Charter and have no further obligations under the Charter.

82.     CME also prays for its costs and attorneys' fees incurred by CME in rescinding the Charter.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against Gretchen/Kyma, rescinding the Charter and relieving CME of any further obligation under the Charter, and awarding CME its costs and attorneys' fees incurred by CME in rescinding the Charter.

## COUNT II

### (Fraud in the Inducement – Damages – Against All Defendants)

83.     Plaintiff CME repeats and realleges each and every allegation set forth in paragraphs 1-72 hereof with the same force and effect as if fully set forth herein.

84.     Defendants Gretchen and Kyma convinced Vazquez to act on their behalf during the Charter negotiations, in exchange for which agreement Vazquez would share a brokerage commission with Defendant Harrington.  To keep secret the existence of Vazquez's financial interest, Kyma/Gretchen typed into the Charter that the recipient of such commission was "V&H Ventures, Ltd."  Even though Kyma/Gretchen typed "V&H Ventures, Ltd." into the Charter as a commission recipient, Kyma/Gretchen knew that "V&H Ventures, Ltd." would not be receiving the actual commission for the Charter because Kyma/Gretchen's periodic payments are not made to "V&H Ventures, Ltd.," but rather to Vipsen and the Firm.  The signatory of the Charter for Gretchen, Lambros Katsoufis, is a Florida-licensed attorney.

85.     After this conspiracy had been arranged, Defendants all individually and jointly made one or more misrepresentations of material fact or omission to CME.  Specifically,

Defendants represented to CME through their agent Vazquez that several of the aspects of the Charter, including the absence of a *force majeure* clause, the presence of the letter of credit security clause, and the inflated daily hire rate, were standard and unobjectionable clauses when in fact they were not.  Furthermore, Defendants represented to CME directly that the increased War Risk Insurance cost for the Vessel would be less than $5,000 annually (in reality the cost annually was approximately ten times that amount) and that the Vessel's cargo discharge rate would be 4,500 metric tons per hour (in reality the Vessel never has exceeded 2,000 metric tons per day).

86.     Defendants knew or should have known those representations were false.  With respect to the *force majeure* clause, the Katsoufis family has been in the shipping business for a lengthy period of time.  Paris Katsoufis completely was aware of the fact that Venezuela was an unstable area, as indicated by his comments in his December 11, 2009 e-mail (see Exhibit 5): "*of concern is the state of affairs in Venezuela and the unilateral decisions of its government*." Harrington and Vazquez purported to be qualified professionals in the field.  Yet Kyma/Gretchen used Vazquez to convince CME that a *force majeure* clause was not necessary in a five year contract for the use of the Vessel in support of a Venezuelan-based business operation.  With respect to the charter market, Defendants knew that the proposed daily hire rate significantly exceeded the then-current market rates, but the remainder of the Defendants let Vazquez convince CME of the commercial reasonableness of the Charter.  Similarly, the letter of credit security clause is unique, yet Vazquez advised his clients that the clause was a common one.  As for the Vessel's discharge rate and War Risks Insurance, the numbers represented by Kyma/Gretchen clearly could have been ascertained by Kyma/Gretchen, but instead they represented numbers to CME that were grossly overestimated and underestimated, respectively.

With respect to the discharging rate, CME's interest in the Vessel was that it (purportedly) could discharge over 3,000 metric tons/hour.  As shown by the attached spreadsheet regarding Vessel discharge rates (Exhibit 15), that representation was demonstrably false.

87.    Defendants intended that CME would be induced to act in reliance on one or more of the misrepresentations.  Defendants wanted CME to be induced to act because of the money that could be made by Defendants from the scheme.   Gretchen and Kyma stood to make collectively approximately $10,000/day more than prevailing market rates, which has translated into over $13 million extra over the last 3 years, 8 months.   Harrington/Vipsen and Vazquez/Firm collectively have made approximately $1 million as a result of the scheme.

88.    CME did in fact act in justifiable reliance on one or more of the misrepresentations made by Defendants and suffered injury and damage as a result.  CME was entitled to rely upon its own attorneys (Vazquez and the Firm) to zealously represent CME's interests in the Charter negotiation.  Vazquez and the Firm were ethically obligated to act solely in CME's interest.  Vazquez and the Firm were ethically obligated to tell CME if they stood to gain financially from CME's entering into the Charter.  Not only did Vazquez and the Firm not reveal this financial conflict, but also Defendants all conspired to obscure the identity of the parties receiving the commission by using the reference "V&H Ventures, Ltd."  In doing this, Defendants deliberately hid the fact that Vazquez and the Firm stood to gain financially from the Charter's execution.  Furthermore, Kyma's/Gretchen's Lambros Katsoufis, the person signing for Gretchen, is a Florida-licensed lawyer who should have been well-aware of the conflict of interest raised by the situation.

89.    CME also had a right to expect that its attorney would have the proper expertise to advise CME on those matters on which he accepted retention.  Therefore, when CME heeded

Vazquez and the Firm's advice to enter into the Charter with the objectionable terms mentioned above, CME did so based upon the justifiable belief that its attorney would provide informed and conflict-free advice that would be in CME's best interests. Instead, Vazquez and the Firm acted as an advocate for Kyma and Gretchen in urging CME to execute the Charter. Had CME been aware of Vazquez's and the Firm's financial interest in the Charter, CME would have hired other counsel to advise it on the Charter negotiations.

90.    The effect of the Charter was to cause CME substantial actual damage as described above presently in an amount in excess of $26,445,000, excluding interest, costs, attorneys' fees, constituting the amount owed to CME by Defendants because of the fraudulent acts.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against Defendants, jointly and severally, for compensatory damages in the amount of $26,445,000 (as near as can be presently estimated), prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT III

**(Florida's Deceptive and Unfair Trade Practices Act – Against All Defendants)**

91.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

92.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Section 501.201 *et seq.*, prohibits "[u]nfair methods of competition; unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

93.     In violation of FDUTPA, Defendants Gretchen and Kyma convinced Vazquez to act on their behalf during the Charter negotiations, in exchange for which agreement Vazquez would share a brokerage commission with Defendant Harrington.  To keep secret the existence of Vazquez's financial interest so as to deceive CME, Kyma/Gretchen typed into the Charter that the recipient of such commission was "V&H Ventures, Ltd."  Even though Kyma/Gretchen typed "V&H Ventures, Ltd." into the Charter as a commission recipient, Kyma/Gretchen knew that "V&H Ventures, Ltd." would not be receiving the actual commission for the Charter because Kyma/Gretchen's periodic payments are not made to "V&H Ventures, Ltd.," but rather to Vipsen and the Firm.  Defendants used the deceptive practice of employing Vazquez as the Defendants' agent so as to take advantage of CME's reliance on its own attorney to provide conflict-free and informed advice.

94.     Alternatively, Gretchen and Kyma were aware of the actions of Defendants Harrington, Vipsen, Vazquez and the Firm in seeking a commission for the Charter and aided and abetted their actions by adding "V&H Ventures, Ltd." as a commission recipient on the Charter, even though Gretchen and Kyma knew or should have known that the true recipients/beneficiaries of the commission payments were Defendants Harrington, Vipsen, Vazquez and the Firm.

95.     FDUTPA provides, in relevant part, that, "anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."  Fla. Stat. § 501.211(1). Additionally, "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such

person may recover actual damages, plus attorney's fees and court costs . . . ."  Fla. Stat. § 501.211(2).

96.     Defendants' violation of FDUTPA has caused CME to suffer injury, including, *inter alia*, (a) paying artificially and unfairly inflated charter hire prices for the Vessel, and (b) being unable to use a *force majeure* clause to terminate the Charter in the face of the nationalization of the Venezuelan iron ore industry.  As a direct and proximate result of Defendants' violation of FDUTPA, CME has suffered monetary damages.

97.     CME is entitled to all applicable damages, including a declaration that Defendants violated FDUTPA, damages, attorneys' fees, and costs of suit, pursuant to sections 501.2105 and 501.211(1) and (2) of the Florida Statutes.

98.     Additionally, or in the alternative, CME is entitled to injunctive relief to enjoin CME from being further damaged by Defendants' actions.  Specifically, CME is entitled to a court order enjoining Defendant Gretchen Shipping from collecting further payments under the Charter, drawing down on the Citibank Letter of Credit, and thereby preventing all of the remaining Defendants from derivatively benefitting from Gretchen's collecting further payments under the Charter, because of Defendants' unconscionable, unfair and/or deceptive acts or practices committed in the course of inducing CME to agree to the Charter.

WHEREFORE, CME respectfully requests that this Court enter judgment in its favor and against Defendants, award compensatory damages to be determined at trial but estimated presently to be $26,445,000, punitive damages, pre-judgment and post-judgment interest, attorneys fees, costs, declaratory relief, pursuant to Section 501.211(1) of the

Florida Statutes, enjoin Defendants from engaging in unconscionable, deceptive and/or unfair trade practices, including of the type specified in this Complaint, pursuant to Section 501.211(1) of the Florida Statutes; and grant all other relief the Court deems just and proper.

## COUNT IV

### (Racketeer Influenced and Corrupt Organization Act – Against All Defendants)

99.     CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

100.     As described above, Defendants acted in concert to defraud CME by inducing CME to enter into the Charter with numerous fraudulent representations, including but not limited to hire rates represented to be market rates but instead were well above market rates, representing that the Vessel's discharge rate was approximately 4500 metric tons/hour when in fact the actual discharge rate never has sustained half that rate, representing that the absence of a *force majuere* clause was customary, representing that the Letter of Credit Security Clause was commonplace, and representing that War Risk Insurance for the Vessel would be much less than it actually turned out to be.

101.     Defendants' fraud continues to be perpetuated, as each hire statement tramsmitted by e-mail seeks to recover the excessive market rates procured in the Charter as well as the commission payments purportedly payable to "V&H Ventures Ltd." under the Charter but in reality paid the Defendants Firm and Vipsen as continuing payment for those Defendants' role in the conspiracy.

102.     To commit their fraud, Defendants have used wire and mail, including numerous e-mails from Defendants to CME pre-Charter to induce CME to Charter the Vessel.  The e-mails

were sent by each Defendant to CME and induced CME to send e-mails in return. Those e-mails crossed state lines, in that CME's server is located in Venezuela. Furthermore, the commission payments made by Defendants Gretchen and Kyma to Defendants Firm and Vipsen are made from a Toronto office of Western Union to Defendants Firm's and Vipsen's U.S. bank accounts.

103.   The foregoing facts constitute multiple-count violations of the Racketeer Racketeer Influenced and Corrupt Organization Act ("RICO").

104.   Defendants violations of RICO have caused CME to suffer injury, including, *inter alia*, (a) paying artificially and unfairly inflated charter hire prices for the Vessel, and (b) being unable to use a *force majeure* clause to terminate the Charter in the face of the nationalization of the Venezuelan iron ore industry. As a direct and proximate result of Defendants' violation of RICO, CME has suffered monetary damages.

105.   CME is entitled to all applicable damages, including a declaration that Defendants violated RICO, damages, attorneys' fees, and costs of suit, as well as treble damages under the RICO statute.

106.   Additionally, or in the alternative, CME is entitled to injunctive relief to enjoin CME from being further damaged by Defendants' actions. Specifically, CME is entitled to a court order enjoining Defendant Gretchen Shipping from collecting further payments under the Charter, and thereby preventing all of the remaining Defendants from derivatively benefitting from Gretchen's collecting further payments under the Charter, because of Defendants' violations of RICO.

WHEREFORE, CME respectfully requests that this Court enter judgment in its favor and against Defendants, award treble damages to be determined at trial but estimated

presently to be $79,335,000, pre-judgment and post-judgment interest, attorneys fees, costs, declaratory relief, enjoin Defendants from engaging in RICO-violative acts, including of the type specified in this Complaint, and grant all other relief the Court deems just and proper.

## COUNT V

**(Frustration of Contract – Against Defendants Gretchen and Kyma)**

107.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

108.    CME, as a commodities trading company, is not in the business of operating vessels.

109.    CME chartered the Vessel for the sole purpose of replacing FMO's retiring vessel, and the sole purpose for which the Vessel was to be used was in the shuttle service transporting iron ore between the Venezuelan mines and the *M/V BOCA GRANDE II*.   This was the sole reason that CME chartered the Vessel.

110.    The Venezuelan military's cancellation of all of FMO's contracts, including the contract that CME had with FMO, has left CME with no use for the Vessel.

111.    CME and Gretchen/Kyma entered the Charter with the assumption that the Vessel would be able to be used as part of CME's iron ore operation during the entire 5 years of the Charter.

112.    As a result of the foregoing, the Charter has been frustrated, thereby entitling CME to rescind the Charter and have no further obligations under the Charter.

113.    CME also prays for its costs and attorneys' fees incurred by CME in rescinding the Charter.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against Gretchen/Kyma, rescinding the Charter and relieving CME of any further obligation under the Charter, and awarding CME its costs and attorneys' fees incurred by CME in rescinding the Charter.

## COUNT VI

### (Negligent Misrepresentation – Against All Defendants)

114.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

115.    As more particularly described above, to induce CME to enter into the Charter, Defendants made negligent misrepresentations and omissions of material fact, including but not limited to:

    a.    All Defendants omitted telling CME that Vazquez and the Firm had a financial interest in the execution of the Charter;

    b.    All Defendants omitted telling CME that Gretchen shipping intended to pay a "shipbroker" even though Clause 1 of the Charter (entitled "Shipbroker") was empty;

    c.    All Defendants omitted telling CME that "V&H Ventures, Ltd." was not going to be paid under Clause 24, but rather Vipsen and the Firm would be paid instead;

    d.    Vazquez and the Firm misrepresented to CME that it was acceptable and commonplace in the industry to enter a five year time charter parter involving operations inside Venezuela without an included *force majuere* clause;

e.      Vazquez and the Firm misrepresented to CME that the Charter's daily hire rate of approximately $10,000 per day over then-prevailing market rates was acceptable;

f.      Vazquez and the Firm misrepresented to CME that the Charter's "Security" clause (Clause 25) requiring CME to obtain a $2.5 million standby irrevocable letter of credit was acceptable and commonplace in the industry;

g.      Defendants Gretchen and/or Kyma misrepresented to CME that the Vessel's discharge rate was 4,500 metric tons/hour when in fact the Vessel frequently has discharged at less than half that rate; and

h.       Defendants Gretchen and/or Kyma misrepresented to CME that the War Risk Insurance premium increase that CME would have to pay as a result of the Vessel trading in Venezuelan waters was less than $5,000 per year, whereas in fact the increase in premiums per year was approximately $130,000.

116.    Each of the foregoing representations and material omissions was false.

117.    Defendants made their misrepresentations and omissions intentionally and/or negligently, to induce CME to rely and act on them and to induce CME to enter the Charter by which all of the Defendants benefited.  Defendants intended that CME would be induced to act in reliance on one or more of the misrepresentations.  Defendants wanted CME to be induced to act because of the money that could be made by Defendants from the scheme.  Gretchen and Kyma stood to make collectively approximately $10,000/day more than prevailing market rates, which has translated into over $13 million extra over the last 3 years, 8 months.

Harrington/Vipsen and Vazquez/Firm collectively have made approximately $1 million as a result of the scheme.

118.   In deciding to enter the Charter, CME justifiably relied on Defendants' misrepresentations and omissions.  CME was entitled to rely upon its own attorneys (Vazquez and the Firm) to zealously represent CME's interests in the Charter negotiation.  Vazquez and the Firm were ethically obligated to act solely in CME's interest.  Vazquez and the Firm were ethically obligated to tell CME if they stood to gain financially from CME's entering into the Charter.  Not only did Vazquez and the Firm not reveal this financial conflict, but also Defendants all conspired to obscure the identity of the parties receiving the commission by using the reference "V&H Ventures, Ltd."  In doing this, Defendants deliberately hid the fact that Vazquez and the Firm stood to gain financially from the Charter's execution.  Furthermore, Kyma's/Gretchen's Lambros Katsoufis, the person signing for Gretchen, is a Florida-licensed lawyer who should have been well-aware of the conflict of interest raised by the situation.

119.   CME also had a right to expect that its attorney would have the proper expertise to advise CME on those matters on which he accepted retention.  Therefore, when CME heeded Vazquez and the Firm's advice to enter into the Charter with the objectionable terms mentioned above, CME did so based upon the justifiable belief that its attorney would provide informed and conflict-free advice that would be in CME's best interests.  Instead, Vazquez and the Firm acted as an advocate for Kyma and Gretchen in urging CME to execute the Charter.  Had CME been aware of Vazquez's and the Firm's financial interest in the Charter, CME would have hired other counsel to advise it on the Charter negotiations.

120.    As a result of Defendants' misrepresentations and omissions, CME has sustained substantial actual damage as described above presently in an amount in excess of $26,445,000, excluding interest, costs, attorneys' fees.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against Defendants, jointly and severally, for compensatory damages in the amount of $26,445,000 (as near as can be presently estimated), prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT VII

### (Tortious Interference With a Business Relationship – Against Defendants Gretchen, Kyma, Vipsen, and Harrington)

121.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

122.    A business relationship existed between CME and the Firm/Vazquez, by which relationship CME paid Firm/Vazquez for accurate and conflict-free legal advice rendered by Firm/Vazquez.

123.    Defendants Gretchen, Kyma, Vipsen and/or Harrington knew, or reasonably should have known, that Vazquez and the Firm were in a business relationship with CME. Vazquez represented CME during the Charter negotiations and he even was referred to by Gretchen and/or Kyma personnal as CME's lawyer in contemporaneous correspondence.

124.    Defendants Gretchen, Kyma, Vipsen and/or Harrington intentionally interfered with CME's business relationship with Vazquez and the Firm by offering Vazquez a commission for his role in obtaining CME's agreement to enter the Charter.  Defendants Gretchen, Kyma,

Vipsen and Harrington had no justification for their intentional interference with CME's business relationship with Vazquez and the Firm.

125.    As a result of Defendants Gretchen, Kyma, Vipsen and Harrington with CME's business relationship with Vazquez and the Firm, CME has sustained substantial actual damage as described above presently in an amount in excess of $26,445,000, excluding interest, costs, attorneys' fees.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against Defendants, jointly and severally, for compensatory damages in the amount of $26,445,000 (as near as can be presently estimated), prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT VIII

**(Breach of Fiduciary Duty – Against Defendants Firm and Vazquez)**

126.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

127.    As CME's lawyer, the Firm and Vazquez had special knowledge, trust, and confidence with CME, and the Firm and Vazquez had special knowledge of CME's business operations and needs.

128.    CME relied on its fiduciary relationship with the Firm and Vazquez when entering into the Charter based on the Firm's and Vazquez's legal training concerning the acceptability of the terms and conditions of the Charter.

129.    The Firm and Vazquez breached their fiduciary duties as legal counsel to CME when Vazquez (as a member of the Firm) failed to disclose to CME his financial interest in the execution of the Charter, which interest is estimated as approximately $500,000 to date.

130.    The Firm and Vazquez breached their fiduciary duties as legal counsel to CME when Vazquez (as a member of the Firm) acted out of their own financial interests in convincing CME to execute the Charter rather than providing CME the independent and conflict-free legal advice that CME expected, and was entitled, to receive when CME retained Vazquez and the Firm to represent CME during the Charter negotiations.

131.    CME has suffered substantial actual damage as described above presently in an amount in excess of $26,445,000, excluding interest, costs, attorneys' fees, as a result of Vazquez's and the Firm's breach of fiduciary duty.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against the Defendants Firm and Vazquez, jointly and severally, for compensatory damages in the amount of $26,445,000, plus prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT IX

### (Legal Malpractice – Against Defendants Firm and Vazquez)

132.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

133.    CME retained the Firm and Vazquez to represent CME in its negotiations with Gretchen and Kyma regarding the Charter.

134.    The Firm and Vazquez neglected their reasonable duty to represent CME without a conflict of interest, in that when the Firm and Vazquez represented CME in negotiating the Charter the Firm and Vazquez knew that they stood to reap a significant financial benefit (currently approximately $500,000) in convincing CME to execute the Charter on the terms

presented.  Furthermore, with respect to the Vessel's daily hire rate, as Vazquez's and the Firm's commission would be greater if the daily hire rate was greater, Vazquez and the Firm likewise has a financial conflict with respect to negotiating a lower daily hire rate for the Vessel.

135.    The Firm and Vazquez also neglected their reasonable duty to represent CME competently in that the advice provided by Vazquez and the Firm were below the acceptable standard of skill and competence required by an attorney, in that Vazquez and the Firm advised CME to agree to the Charter containing the following terms:

      a.    Vazquez and the Firm misrepresented to CME that it was acceptable and commonplace in the industry to enter a five year time charter parter involving operations inside Venezuela without an included *force majuere* clause;

      b.    Vazquez and the Firm misrepresented to CME that the Charter's daily hire rate of approximately $10,000 per day over then-prevailing market rates was acceptable; and

      c.    Vazquez and the Firm misrepresented to CME that the Charter's "Security" clause (Clause 25) requiring CME to obtain a $2.5 million standby irrevocable letter of credit was acceptable and commonplace in the industry.

136.    CME has suffered substantial actual damage as described above presently in an amount in excess of $26,445,000, excluding interest, costs, attorneys' fees, as a result of Vazquez's and the Firm's breach of fiduciary duty.

WHEREFORE, Plaintiff CME requests the Court to enter judgment in its favor and against the Defendants Firm and Vazquez, jointly and severally, for compensatory damages in the amount of $26,445,000, plus prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT X

### (Stay Pending Arbitration – Against All Defendants)

137.    CME repeats and realleges each and every allegation set forth in paragraphs 1-72 and 84-90 hereof with the same force and effect as if fully set forth herein.

138.    Under the Charter, CME and Gretchen agreed to arbitrate claims "arising out of or in connection with this [Charter]."

139.    Kyma dominates and controls Gretchen such that Gretchen is an alter ego of Kyma.  Kyma should likewise be compelled to arbitrate as a result of its dominance and control of Gretchen.

140.    Defendants Vazquez, Firm, Harrington, and Vipsen all should be required to arbitrate CME's claims because they are beneficiaries of Clause 24 of the Charter.   The aproximate $1 million that they have received in commissions has been received by virtue of the deceptive use of "V&H Ventures, Ltd." in the Charter to conceal the true identity of the persons that Gretchen/Kyma intended to pay a commission.  As the issues surrounding this arrangement are integral to the determination CME's claims against Defendants, Defendants Vazquez, Firm, Harrington, and Vipsen should be estopped from contesting that they are not bound by the arbitration clause.

WHEREFORE, with the exception of ruling on the injunctive relief requested by CME, this Court should stay proceedings on the merits and order all Defendants to participate in New York arbitration under the Charter.

Dated: November 1, 2013
      New York, New York

                         Respectfully submitted,

By: _____
                        Michael J. Frevola
                        Christopher R. Nolan
                        F. Robert Denig
                        Marie E. Larsen
                        HOLLAND & KNIGHT LLP
                        31 West 52nd Street
                        New York, NY 10019
                        Telephone:  (212) 513-3200
                        Facsimile:  (212) 385-9010
                        Email: michael.frevola@hklaw.com
                                christopher.nolan@hklaw.com
                                robert.denig@hklaw.com
                                marie.larsen@hklaw.com

                        *Counsel for Commodities & Minerals Enterprise Ltd.*

#26202786_v1